[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 916 
Bobby L. Moore and Melba Jean Moore sued Prudential Residential Services Limited Partnership ("Prudential Residential"); Prudential Homes Corporation ("Prudential Homes"); Prudential South O'Town Realty, Inc. ("South O'Town"); Herbert G. Sanders; Nancy Rogers; Lou Thorne; Thorne Realty, Inc.; David F. Lundy; and Cherry Ann Lundy. The Moores alleged, against one or more of these defendants, breach of contract, fraudulent misrepresentation, fraudulent suppression, conspiracy, breach of fiduciary duty, negligence, and wantonness in the sale of the Lundys' house to the Moores. The trial court entered a summary judgment in favor of each of the defendants. The Moores appealed. We affirm in part, reverse in part, and remand.
 I. Factual Background and Procedural History
Jean Moore worked as a real estate agent in the late 1960's and again for a brief period in the mid-1980's. Bobby Moore is a retired insurance adjuster. In May 1996, the Moores asked Lou Thorne, their real estate agent, to schedule an appointment for them to view the house that is the subject of this action. Thorne contacted Rogers, the listing agent for the house, at South O'Town and arranged for the Moores to view the house. The Lundys, the occupants of the house, were selling the house because David Lundy was being transferred by his employer. David Lundy's employer had an agreement with Prudential Relocation, a division of Prudential Residential, pursuant to which Prudential Relocation assisted transferred employees in selling their homes. Rogers identified Prudential Relocation as the seller of the house, and she testified that she represented Prudential Relocation in the transaction.
Thorne accompanied the Moores to the house during their first visit. Rogers and Cherry Lundy were also present. The Moores walked through the house and inspected each room during this visit. The *Page 917 
house was furnished; thus, some portions of the walls were not visible. Neither the Moores nor Thorne asked Rogers or Cherry Lundy to move any of the furniture so they could view the portions of the walls hidden behind the furniture. Jean Moore testified that, while they were inspecting the basement den, she asked Rogers if there was "any type of water problem in this basement" and that Rogers said, "No." Bobby Moore also testified that while he was in the basement, he asked Cherry Lundy, "Have you ever had any water come through the walls? And [Cherry Lundy] said, `No, sir, we have never had any water problems in the basement.'" Thorne testified that she asked both the Lundys and Rogers if there were any water problems with the house; that she heard the Moores ask the Lundys on at least three occasions if there were any water problems with the house; and that Cherry Lundy responded that they had never had any water problems. Thorne further testified that on one or two occasions Rogers was present when the Moores asked Cherry Lundy about water problems with the house. Thorne testified that Rogers responded that "[t]o her knowledge, there had never been any water problems."
Rogers testified that the Lundys told her that the house was in good condition with the exception of a gutter that needed repair; that the Lundys never told her about any water problems with the house; and that she was unaware of any water-related problems. Rogers further testified that no one, including the Moores, ever asked her if there were any water problems with the house.
Jean Moore testified that Rogers told the Moores that the house had been inspected on two occasions before they visited the house. Jean Moore said that Rogers informed her and her husband that all of the repairs that had been indicated as a result of those inspections had been made, except for the addition of a fire wall. Rogers denied telling the Moores that all those repairs had been completed.
The Moores returned to visit the house a second time the evening of the day of their first visit. They again viewed most of the rooms of the house. After this second visit, the Moores decided to make an offer for the house. Thorne prepared a contract and the Moores made an offer. The Moores' offer was to be subject to a "conventional appraisal," not "as is." The Lundys counter offered with an increased price and by writing "as is" on the contract. The contract had alternative paragraphs, one of which had to be initialed by both parties to become part of the contract. Paragraph A stated that the home was to be sold "as is." Paragraph B stated that the sale was subject to a "conventional appraisal" and included a blank where the maximum dollar value of the repairs the seller was required to make was to be written in. Thorne testified that Rogers told her that the house had to be sold "as is" because there had already been two home inspections. Thorne testified that the Moores were not happy buying the home "as is," but that Bobby Moore nevertheless said: "We will go ahead and take the contract."
After some other minor changes, including the Moores' agreeing to permit the Lundys to stay in the house one month after the closing, Thorne prepared another copy of the sales contract, which both parties accepted. The contract recognized Prudential Residential as the seller of the home pursuant to its agreement with David Lundy's employer. Kimberly Clare signed the contract on behalf of Prudential Residential. The sales contract states in part: *Page 918 
 "9. CONDITION OF THE PROPERTY: NEITHER SELLER NOR ANY AGENT MAKES ANY REPRESENTATIONS OR WARRANTIES REGARDING CONDITION OF THE PROPERTY EXCEPT TO THE EXTENT EXPRESSLY SET FORTH HEREIN. Purchaser has the obligation to determine any and all conditions of the Property material to Purchaser's decision to buy the Property, including, without limitation, the condition of the heating, cooling, plumbing, and electrical systems and any built-in appliances and the roof and the basement, including leaks therein; the size and area of the Property; construction materials, including floors; structural condition; utility and sewer or septic tank availability and condition; subsurface conditions, including radon and other potentially hazardous materials and/or gases; and any matters affecting the character of the neighborhood. Purchaser shall have the opportunity to determine the condition of the Property in accordance with `A,' `B,' or `C' below as selected by the parties. . . .
 "SELECT EITHER `A' OR `B' OR `B' and `C' BELOW BY INITIALING — CHOICE MUST BE INITIALED BY BOTH PARTIES TO BE PART OF THE CONTRACT.
". . . .
 "B. Purchaser has inspected the Property, either personally or through others of Purchaser's choosing, and, without relying on any representation or warranty from Seller or Broker or any salesperson or any printed or written description of the Property, accepts the Property in its present `as is' condition, including ordinary wear and tear to closing, except that Seller agrees (subject to any dollar limits below) to (i) make any repairs required by the lending institution; (ii) deliver the heating, cooling, plumbing, and electrical systems and any built-in appliances in normal operating condition at the time of the closing; and (iii) perform the following Conv. Appraisal. REPAIRS REQUIRED OF SELLER UNDER PARAGRAPH (B) SHALL NOT EXCEED $-0-. . . ."
(Capitalization original; some emphasis original; some emphasis supplied.) Both the Moores and Kimberly Clare initialed this section. Following this section was the following statement:
 "Purchaser has the right and responsibility to walk through and inspect the Property prior to closing and notify Seller immediately if the Property is not in the condition agreed under `A,' `B,' or `C' above, whichever one has been selected by the parties. After closing, all conditions of the property are the responsibility of the Purchaser."
The contract then included the following disclaimer:
 "10. DISCLAIMER: Seller and Purchaser acknowledge that they have not relied upon advice or representations of Broker (or Broker's associated salespersons) relative to . . . (ii) structural condition of the Property, including condition of the roof and basement, . . . (iv) the nature and operating condition of the electrical, heating, air conditioning, plumbing, water, heating systems and appliances; . . . (ix) any other matters affecting their willingness to sell or purchase the Property on the terms and price herein set forth. Seller and Purchaser acknowledge that if such matters are of concern to them in the decision to sell or purchase the Property, they have sought and obtained independent advice relative thereto."
Both the Moores and Kimberly Clare also initialed this disclaimer. *Page 919 
The last clause of the contract, just above the parties' signatures, states:
 "19. ENTIRE AGREEMENT: This Contract constitutes the entire agreement between Purchaser and Seller regarding the Property, and supercedes all prior discussion, negotiations and agreements between Purchaser and Seller whether oral or written. Neither Purchaser, Seller, nor Broker or any sales agent shall be bound by any understanding, agreement, promise, or representation concerning the Property, expressed or implied, not specified herein.
 "THIS IS INTENDED TO BE A LEGALLY BINDING CONTRACT. IF YOU DO NOT UNDERSTAND THE LEGAL EFFECT OF ANY PART OF THIS CONTRACT, SEEK LEGAL ADVICE BEFORE SIGNING."
(Capitalization original; emphasis in contract.) The Moores and Kimberly Clare also signed a rider to the sales contract before the closing that stated, in part:
 "2. Condition of Premises: Buyer understands that Seller is a relocation management service and has never lived on or in the Property. The Property, including the contents, being sold and purchased are not new, and are being sold `as is,' in their present condition. Neither Seller nor any of its agents are making or have made any representations concerning the Property. . . .
". . . .
 "4. Buyer's Duty to Inspect/Test: Buyer agrees to inspect or to have the Property inspected by others on Buyer's behalf to determine the existence of defects, if any. All inspections shall be at Buyer's sole cost and expense. Seller recommends that Buyer secure such surveys, professional building inspection reports, . . . and other reports and inspections as are appropriate to determine the condition of the Property."
The rider also stated: "Buyer shall have the right to make a final inspection of the Property immediately prior to settlement to be sure that its condition has not deteriorated from the date of the Agreement and Rider (ordinary wear and tear excepted)."
After entering into the sales contract for the purchase of the house, the Moores made at least two other visits to the house before the closing. The Moores showed the house to a friend and videotaped the inside of the house. The Moores also made a final "walk-through" of the house before the closing.
The Moores also received a copy of the "Relocation Home Inspection Report" before the closing. Jean Moore testified that Rogers faxed the inspection report to Thorne, but Rogers testified that she never saw the inspection report and that she believed that Prudential Relocation had faxed it directly to Thorne. This inspection report had been prepared for Prudential Relocation in February 1996. The inspection report cited a few defects in the house, including rusted gutters and a leak at one toilet, but it stated that surface water control and the roof, bearing walls and floors, water pipes, drainpipes, and the tub and shower combination were acceptable. The inspection report also stated that there was no evidence of ongoing water penetration in the basement or attic.
The last page of the six-page inspection report stated: "This report and form is much more limited than a typical whole house inspection which is normally obtained by a buyer when purchasing a home." The inspection report further stated: "The inspection was visual, not technical. . . . No opinion is given as to the advisability of the purchase of the property." The inspection report also stated the following, under the heading "Exclusions": *Page 920 
 "The inspection and this report were completed solely for Prudential, to provide Prudential with information about the property, and are not intended to be used by any party, including but not limited to, buyers, seller, lenders, real estate brokers/agents, and or appraisers, other than Prudential. Prudential is providing this report to prospective buyers in order to comply with it's [sic] disclosure obligations under the law. This report is not a representation, guarantee, or warranty of the condition of the property. Neither the inspection company nor Prudential assume any liability to any third parties in connection with the inspection or this report, including but not limited to liability in connection with unreported defects or conditions, the cost of any repairs, personal injury, or any losses, damages or expenses of any other nature."
The report concluded by urging prospective buyers to obtain their own home inspection before purchasing the house, stating that "[t]he American Society of Home Inspectors at (708) 280-1919 can be contacted for assistance in locating an inspector."
The other inspection report was prepared by an independent home inspector for another prospective purchaser. Rogers testified that she had never seen this report and had no firsthand knowledge regarding the report, but that she had seen a list of requested repairs that the prospective purchaser's agent had asked the Lundys to make based on that report. Rogers also testified that she provided this list of repairs to Thorne. Jean Moore testified that Rogers told the Moores that she could not obtain a copy of this inspection report for them from the previous purchaser because it was privileged information. No party was able to obtain a copy of this inspection report, and neither the inspection report nor the list of requested repairs appears in the record. The only items Rogers could recall from the list of repairs were a "problem" with the gas grill, an improperly attached deck, a loose handrail, and "something about a gutter." Jean Moore testified that Rogers told the Moores at closing that "everything on both inspections had been done" with the exception of the installation of a fire wall, which was not required by law. Rogers, however, testified that she did not tell the Moores that everything revealed by the inspection reports had been fixed. Rogers testified that she told Thorne that David Lundy had said that he had made repairs for the previous prospective purchaser and that he had made all the repairs he was going to make to the property.
Jean Moore testified that Rogers did not tell them that they could not have an additional home inspection performed. However, she testified that Rogers said: "[T]here is no use to have one. There has [sic] been two, and that's a waste of money." Jean Moore testified that she let Rogers "more or less sway me that there wasn't one needed." Jean Moore further testified that she asked Thorne what they should do and that Thorne said: "[W]ell, Nancy has assured us there's been two, that there is [sic] no problems, and it's going to cost you another four to five hundred dollars" for a third home inspection. Jean Moore also testified: "I never would take somebody's hundred percent word, there's nothing wrong with this house. That was for the inspector to come in and find or not find, to me." Thorne testified that she was present when Rogers asked the Moores if they wanted a third inspection. Thorne testified: "They said no, since there had already been two." Thorne further testified that the Moores asked her if they should get a third inspection, and that she told them she did not *Page 921 
believe it was necessary because, she said, the house had already been inspected twice and it appeared that all of the repairs called for in those inspections had been made.
The Moores took possession of the house several weeks after closing. After taking possession, they discovered a number of defects in the house: rotted soffit and damaged gutters on the front of the house; a burst pipe that had caused the studs and the floor in the hallway to rot; loose parquet tiles in the hallway floor caused by the excess moisture; wastewater that had seeped into a wall and into the basement bathroom; rotted baseboard along the basement wall; yellowed carpet in the basement (which had been replaced in March) caused by moisture; cracks in almost every door in the house when the excess moisture dried out; a roof that leaked into a light fixture; inoperable kitchen light fixtures with faulty wiring; chimneys that leaked because they were not sealed; a bathtub that leaked and damaged the basement ceiling; a second-floor toilet that leaked damaging the wall in the first-floor bathroom; water stains on the ceiling in every room; plasterboard in the kitchen damaged by excess moisture; surface water that had penetrated the basement wall; and the rotted wood underneath the steps going from the first floor to the basement caused by water damage. Jean Moore testified that a roofer they asked to repair the roof said, "Lady, you bought a rotting, falling down dump."
As previously noted, Jean Moore had worked as a real estate agent and Bobby Moore had worked as an insurance adjuster. Bobby Moore testified that, as an insurance adjuster, he occasionally assessed storm damage to houses — including water damage — and that he recognized the signs of water leakage in houses. The Moores had also purchased at least six other pieces of real property and had sold at least four pieces of real property before they purchased this house. Prudential Residential offered the affidavit of its director for client services, Sharon Adkinson. Adkinson stated that South O'Town was an independent contractor hired by Prudential Residential to facilitate the sale of the Lundys' house. Adkinson further stated that Prudential Residential neither reserved nor exercised control over how South O'Town or its employees sold the house, "so long as the sale occurred within the parameters of the agreement between Mr. Lundy and South O'Town."
Herbert Sanders is the broker at South O'Town. Sanders testified that South O'Town was a franchise of Prudential Residential. Sanders also testified that Rogers was an independent contractor of South O'Town, and that he did not supervise Rogers. However, he testified that he reviewed her contracts for potential problems. Sanders also testified: "The qualifying broker is responsible for all of their [sic] sales associates when situations come up." The Moores had no contact with Sanders before the closing.
The Moores initially sued Prudential Residential, Prudential Home, South O'Town, Sanders, Rogers, and the Lundys, alleging breach of contract, fraudulent misrepresentation, fraudulent suppression, and conspiracy. The Moores amended their complaint to add a negligence claim against each of those defendants. South O'Town, Sanders, Rogers, Prudential Residential, and Prudential Homes filed motions for a summary judgment. The trial court denied the motions filed by South O'Town, Rogers, and Sanders, but entered a summary judgment for Prudential Residential and Prudential Homes. The Lundys filed a motion to dismiss for want of prosecution. The trial court granted the *Page 922 
Lundys' motion, but later granted the Moores' motion to vacate the order dismissing the Lundys as defendants and reinstated the Moores' claims against them.
The Moores later amended their complaint a second time. This amendment added Thorne and Thorne Realty as defendants and added breach-of-contract and negligence claims against them; breach-of-fiduciary-duty counts against Thorne, Thorne Realty, Rogers, Sanders, and South O'Town; and a wantonness count against the Lundys, Prudential Residential, Prudential Homes, South O'Town, Rogers, and Sanders.[1] Thorne and Thorne Realty settled the Moores' claims against them; they are not parties to this appeal. South O'Town, Sanders, and Rogers then filed a renewed motion for a summary judgment; the trial court granted their motion and entered a summary judgment in their favor. The trial court also entered a summary judgment in favor of the Lundys even though they did not file a summary-judgment motion. Finally, the trial court entered a final judgment dismissing the claims against Thorne and Thorne Realty pursuant to the settlement agreement entered into by the Moores, Thorne, and Thorne Realty. The judgment also stated that all claims against Prudential Residential, Prudential Homes, South O'Town, Sanders, Rogers, David Lundy, and Cherry Lundy had been disposed of pursuant to Rule 12 or Rule 56, Ala.R.Civ.P., and that the orders entered concerning those defendants were now final. The Lundys are not presently represented by counsel, and they did not file a brief with this Court.
 II. Standard of Review
We review a summary judgment de novo. Nationwide Prop. Cas. Ins. Co.v. DPF Architects, P.C., 792 So.2d 369 (Ala. 2001).
 "We apply the same standard of review the trial court used in determining whether the evidence presented to the trial court created a genuine issue of material fact. Once a party moving for a summary judgment establishes that no genuine issue of material fact exists, the burden shifts to the nonmovant to present substantial evidence creating a genuine issue of material fact. `Substantial evidence' is `evidence of such weight and quality that fair-minded persons in the exercise of impartial judgment can reasonably infer the existence of the fact sought to be proved.' In reviewing a summary judgment, we view the evidence in the light most favorable to the nonmovant and entertain such reasonable inferences as the jury would have been free to draw."
792 So.2d at 372 (citations omitted).
 III. Propriety of the Summary Judgments
The Moores devote almost their entire brief to this Court to a discussion of their fraudulent-misrepresentation claim against Rogers. They cite no authority for their conclusory statement that Sanders and South O'Town are vicariously liable for *Page 923 
Rogers's actions. They also cite no authority for their argument that Prudential Residential and Prudential Homes are liable for negligence and are vicariously liable for Rogers's actions. Because the Moores have cited no authority in support of these arguments, we will not consider them. Rule 28(a)(10), Ala.R.App.P.,[2] Whited v. Holmes, 816 So.2d 20,26 (Ala. 2001). Moreover, the Moores do not address in their brief on appeal their conspiracy, wantonness, suppression, or breach-of-contract claims. "`When an appellant fails to argue an issue in [his] brief, that issue is waived.'" Ex parte Martin, 775 So.2d 202, 206 (Ala. 2000) (quoting Boshell v. Keith, 418 So.2d 89, 92 (Ala. 1982)). Thus, the only issues before us are whether the trial court properly entered a summary judgment in favor of Rogers on the Moores' fraudulent-misrepresentation claim against her and whether the trial court properly entered a summary judgment in favor of the Lundys despite their failure to move for a summary judgment. With respect to other issues, we affirm the trial court's summary judgments in favor of Prudential Residential, Prudential Homes, South O'Town, and Sanders.
 A. Fraudulent Misrepresentation as to Rogers
To survive a motion for a summary judgment on a claim for fraudulent misrepresentation, the Moores needed to establish the existence of a genuine issue of material fact as to four elements: "`(1) a false representation, (2) concerning a material existing fact, (3) [reasonably] relied upon by the plaintiff (4) who was damaged as a proximate result.'"Fisher v. Comer Plantation, Inc., 772 So.2d 455, 463 (Ala. 2000) (quotingBaker v. Bennett, 603 So.2d 928, 935 (Ala. 1992)). See also ForemostIns. Co. v. Parham, 693 So.2d 409, 422 (Ala. 1997).
Although Alabama has abrogated the rule of caveat emptor in the sale of new real estate, that rule still applies in the sale of used real estate. Blaylock v. Cary, 709 So.2d 1128, 1130 (Ala. 1997); Ray v.Montgomery, 399 So.2d 230, 233 (Ala. 1980). Thus, in the sale of used real estate, a seller or the seller's agent generally has no duty to disclose to the purchaser any defects in the property. Blaylock, 709 So.2d at 1130; Cato v. Lowder Realty Co., 630 So.2d 378, 382 (Ala. 1993). However, this Court has recognized exceptions to this rule:
 "Under § 6-5-102, Ala. Code, 1975, the seller has a duty to disclose defects to a buyer if a fiduciary relationship exists between the parties. In addition, if the buyer specifically inquires about a material condition concerning the property, the seller has an obligation to disclose known defects."
Commercial Credit Corp. v. Lisenby, 579 So.2d 1291, 1294 (Ala. 1991).
 "Moreover, if the agent (whether of the buyer or of the seller) [or the seller] has knowledge of a material defect or condition that affects health or safety and the defect is not known to or readily observable by the buyer, the agent [or seller] is under a duty to disclose the defect and is liable for damages caused by nondisclosure."
Fennell Realty Co. v. Martin, 529 So.2d 1003, 1005 (Ala. 1988). See alsoBlaylock, 709 So.2d at 1131.
The Moores argue that Rogers had a duty to disclose defects in the property because, they say, they specifically inquired about water problems in the house, and that Rogers breached this duty by *Page 924 
misrepresenting to them that the house had no water problems. The Moores also argue that Rogers misrepresented to them that all relevant repairs that were required according to the previous inspections had been made. They do not argue that either the Lundys or Rogers had "knowledge of a material defect or condition that affects health or safety and the defect is not known to or readily observable by the buyer." Fennell Realty Co., 529 So.2d at 1005. They also do not argue that any of the defendants owed them a fiduciary duty. Lisenby, 579 So.2d at 1294.
Where a purchaser's direct inquiry would otherwise impose a duty of truthful disclosure, this Court has held that a purchaser's fraud claim is precluded by language in a sales contract stating that the purchase is "as is." Leatherwood, Inc. v. Baker, 619 So.2d 1273, 1274 (Ala. 1992);Haygood v. Burl Pounders Realty, Inc., 571 So.2d 1086, 1089 (Ala. 1990);Massey v. Weeks Realty Co., 511 So.2d 171, 173 (Ala. 1987). In Massey, after the purchaser noted damage to some exterior columns, the real estate agent stated that the damage was caused by dry rot and that the damage was inexpensively remedied. The purchaser then signed an "as is" contract for the purchase of the house without having the house inspected for termites. The contract further provided that the realtor did not warrant or guarantee the condition of the property. After he moved into the house, the purchaser found that the house was infested with termites. This Court held that the purchaser "did not have the right to rely on the oral representations of [the agent] made prior to the execution by [the purchaser] of the form containing the `as is' provision and the purchase agreement that provided that the realtor did not warrant or guarantee the condition of the property." Massey, 511 So.2d at 173.
In Haygood, the buyers asked the sellers, themselves real estate agents, if the basement had ever leaked, and the sellers replied, "[N]o, it is well constructed." There was evidence, however, indicating that the sellers had had repair work performed in the basement because of cracks in the foundation walls that had permitted water to penetrate the basement. The buyers signed an "as is" contract for the purchase of the house. The sales contract also contained a clause that stated:
 "`Neither the Seller nor the Broker have made or make any other representations about the condition of the property and the Purchaser agrees that he has not relied on any other representation. . . .'"
571 So.2d at 1089. After holding that the Haygoods had not alleged that they had relied on the misrepresentations, this Court concluded that "even if they had made such an allegation, the plaintiffs' signing of the two documents that indicated no reliance would have made the summary judgment . . . proper." 571 So.2d at 1089.
In Leatherwood, the purchasers asked a real estate agent to inquire about the foundation of a house they were interested in purchasing. The real estate agent contacted the agent who had previously listed the house, and that agent informed her that the sellers knew of only one crack around the air-conditioning system. The Bakers then signed an "as is" sales contract for the property. After the Bakers moved into the house, they discovered severe problems; the house began to crack in several places. The realty company had documents in its possession that indicated that the house had structural problems. This Court held that the Bakers' signing of an "as is" contract prohibited them from pursuing both their negligence and fraud *Page 925 
claims against the realty company. Leatherwood, 619 So.2d at 1274.
Chief Justice Hornsby dissented in Leatherwood. He reviewed the law of other states and concluded that "[v]irtually every other state that has addressed the effect of an `as is' provision in a contract for the purchase of used residential real estate has held that the `as is' provision does not insulate a vendor from liability for fraud."Leatherwood, 619 So.2d at 1276 (Hornsby, C.J., dissenting). After citing numerous cases from other jurisdictions holding that an "as is" clause does not preclude a fraud claim, the dissent stated: "I would abandon the position this Court adopted in Massey, because it distorts the law of this state and permits a vendor to contract away liability for intentional wrongdoing. Instead, I would adopt the position that an `as is' purchase contract does not shield a vendor from liability for fraudulent inducement." 619 So.2d at 1276.
The Moores primarily rely upon Boswell v. Coker, 519 So.2d 493 (Ala. 1987), decided before Leatherwood, for the proposition that a fraud claim is not precluded by "as is" language and contract language stating that no representations were made as to the condition of the property. InBoswell, the purchaser, after signing the sales contract, complained to the seller's real estate agent about the roof. The seller, a bank, instructed the real estate agent to have the roof inspected. After an inspection, the roofer informed the real estate agent that "comparing the cost of repairing the roof to what it would cost to reroof the house, it would be better to reroof the house entirely." 519 So.2d at 494. The seller did not want to put a new roof on the house, but instead instructed the real estate agent to have minor repairs made. The buyer was not told that the roofer had stated that, considering the comparative costs, it would be better to reroof the house. The buyer also claimed that the real estate agent stated that the roof was in excellent condition. After moving into the house, the buyer discovered that the roof leaked. This Court — without citing Massey, which had been decided six months earlier — reviewed cases holding that a real estate agent has a duty to speak truthfully when responding to direct inquiries. Without discussing the import on its analysis of the "as is" language, this Court reversed the summary judgment in favor of the real estate agent, holding that jury questions existed as to whether the real estate agent's failure to respond completely to the purchaser's questions was a breach of her duty to disclose and whether the purchaser's reliance on the real estate agent's statements was reasonable. Boswell, 519 So.2d at 496. Neither the majority opinion nor the dissent in Leatherwood citesBoswell; neither does the opinion in Haygood.
We are unable to reconcile Boswell with Leatherwood, Haygood, andMassey. Even if we were sympathetic to Chief Justice Hornsby's argument that an "as is" statement in a contract should not preclude a fraud claim, at least where such a claim is predicated on an affirmative misrepresentation by the seller or seller's agent, the Moores do not ask us to overrule Haygood, Leatherwood, or Massey. In fact, the Moores do not cite any of these three cases, and no party cites Massey. Given the state of the briefs in this appeal, including the fact that the Lundys are acting pro se and that they have not filed a brief with this Court, and the fact that the Moores are a former real estate agent and an insurance adjuster with experience in evaluating water damage to houses, we decline on this occasion to revisit the rule from Haygood andLeatherwood, cases decided after Boswell, holding that "as is" language in a contract for the purchase of *Page 926 
used residential real estate precludes a fraud claim. Stare decisis commands, at a minimum, a degree of respect from this Court that makes it disinclined to overrule controlling precedent when it is not invited to do so.
Furthermore, Rogers was also entitled to a summary judgment because the Moores presented no evidence indicating that Rogers knew that the house had any water problems. In fact, it is undisputed that the Lundys told Rogers that the house was in good condition and that Rogers was not aware of any water-related problems with the house. As previously noted, the general rule is that a real estate agent has no duty to disclose defects in used residential real estate. Blaylock, 709 So.2d at 1130; Cato, 630 So.2d at 382. However, "if the buyer specifically inquires about a material condition concerning the property, the seller has an obligation to disclose known defects." Lisenby, 579 So.2d at 1294 (emphasis added). Because there is no evidence indicating that Rogers knew about the water problems, Rogers had no duty to disclose such defects, and she was entitled to a summary judgment.
Similarly, a real estate agent cannot be held liable for either fraud or negligence where the agent serves as a "conduit of information" between the seller and the buyer. Fisher, 772 So.2d at 463; Speigner v.Howard, 502 So.2d 367 (Ala. 1987). In Fisher, this Court held that a real estate agent who told a buyer that the roof of a house was in good condition was not liable for fraud "`for merely conveying the statements of [the seller] to the agent of the [plaintiffs]' without evidence of bad faith." 772 So.2d at 464 (quoting Speigner, 502 So.2d at 371). The uncontroverted evidence is that the Lundys told Rogers that the house had no water problems, and the Moores presented no evidence of bad faith on Rogers's part.
There is no evidence indicating that any of the repairs called for by the two inspection reports were not made (except the addition of the fire wall), much less that Rogers knew that any of the repairs noted on the two inspection reports had not been made. The Moores have not produced either the missing inspection report or the list of requested repairs based on that inspection report. The Moores even state in their brief that "the undisputed evidence in this matter reveals that Rogers may not have been privy to [the] inspection." The Moores' argument appears to be that the missing inspection report might have indicated water problems with the house, and, if so, Rogers's statement that all repairs had been made gave a false impression. However, this argument is purely speculative, because the Moores were unable to produce the missing inspection report.
We affirm the trial court's summary judgment in favor of Rogers on all the fraudulent-suppression claims.
 B. The Lundys
There remains the problem of the Lundys' failure to move for a summary judgment. There is no basis in the record upon which to conclude that the trial court converted the Lundys' two-year-old motion to dismiss into a motion for a summary judgment pursuant to Rule 12(b), Ala.R.Civ.P. Even if it had done so, the Moores would have been entitled to notice of the trial court's intention to treat the motion to dismiss as a motion for a summary judgment. Graveman v. Wind Drift Owners' Ass'n, Inc., 607 So.2d 199
(Ala. 1992).
Rule 56(c)(2), Ala.R.Civ.P., gives the nonmoving party certain rights to notice and a hearing after a summary-judgment motion has been filed. Rule 56(c)(2) states: *Page 927 
 "The motion for summary judgment, with all supporting materials, including any briefs, shall be served at least ten (10) days before the time fixed for the hearing, except that a court may conduct a hearing on less than ten (10) days' notice with the consent of the parties concerned. Subject to subparagraph (f) of this rule, any statement or affidavit in opposition shall be served at least two (2) days prior to the hearing."
We recently discussed the requirements of Rule 56(c)(2) in Van Knight v.Smoker, 778 So.2d 801 (Ala. 2000).
 "The Committee Comments to [Rule 78, Ala.R.Civ.P.,] state: `It is to be noted that the last sentence of the rule prohibits the granting of a Motion Seeking Final Judgment such as a Motion for Summary Judgment without giving the parties an opportunity to be heard orally.' (Emphasis added [in Van Knight].) Rule 56(c), Ala.R.Civ.P., itself entitles the parties to a hearing on a motion for summary judgment. Although, in certain limited circumstances, a trial court may rule on a motion for summary judgment without conducting a hearing, once the trial court has set a date for a hearing on the motion, the court must allow the nonmoving party an opportunity to be heard.
". . . .
 "One purpose of the procedural rights to notice and hearing under Rule 56(c) is to allow the nonmoving party the opportunity to discover and to present evidence opposing the motion for summary judgment. Although the nonmoving party may waive the requirements of notice and hearing, the `waiver requires knowledge, actual or implied, of the right being waived.' In Tharp [v. Union State Bank, 364 So.2d 335 (Ala.Civ.App. 1978)], the defendant attended a hearing conducted for the purpose of considering a motion to dismiss a counterclaim. However, at that hearing, the trial court also granted summary judgment in favor of the plaintiffs. The defendant objected to the entry of summary judgment on the ground that it was not aware that the summary-judgment motion would be discussed and decided at the hearing. The Tharp court held that `[t]his objection to the entry of summary judgment and the state of the record showing that ten days had not expired since even the certified date of service [of the motion for summary judgment] negates any claim of waiver.' 364 So.2d at 338. The Tharp court noted that the plaintiff's argument that the defendant was not prejudiced against it was invalid because Rule 56 `is not prefaced upon whether or not the opposing party may successfully defend against summary judgment, [but] it does require that the opportunity to defend be given.' Tharp, 364 So.2d at 338."
778 So.2d at 805-06 (emphasis in final quoted paragraph added; footnote and citations omitted).
Because Rule 56 requires, at the least, that the nonmoving party be provided with notice of a summary-judgment motion and be given an opportunity to present evidence in opposition to it, the trial court violates the rights of the nonmoving party if it enters a summary judgment on its own, without any motion having been filed by a party. Consequently, we reverse the trial court's summary judgment in favor of the Lundys, entered without a motion filed by them or on their behalf.
 IV. Conclusion
We reverse the judgment in favor of the Lundys and remand the case for further proceedings consistent with this opinion. *Page 928 
We affirm the judgments in favor of the remaining defendants.
AFFIRMED IN PART; REVERSED IN PART; AND REMANDED.
Moore, C.J., and Houston, See, Brown, Johnstone, Harwood, Woodall, and Stuart, JJ., concur.
[1] At the time the Moores filed their second amended complaint, the trial court had already entered a summary judgment in favor of Prudential Residential and Prudential Homes on all of the Moores' claims against them. Even though the second amended complaint asserted breach-of-contract, negligence, and wantonness claims against Prudential Residential and Prudential Homes, the Moores acknowledged: "Defendants Prudential Residential Services and Prudential Homes have been granted a nonfinal judgment in this matter. The Moores specifically reserve the right to seek reinstatement of these defendants at such time as the evidence may reveal disputed issues of facts relating to the claims against these defendants under this amendment, the first amended complaint and the complaint heretofore filed in this action."
[2] Rule 28, Ala.R.App.P., was amended effective June 1, 2002. Before that amendment, Rule 28(a)(5) addressed a party's failure to cite authority.