Rel: July 18, 2025

**Notice:** This opinion is subject to formal revision before publication in the advance sheets of **Southern Reporter**. Readers are requested to notify the **Reporter of Decisions**, Alabama Appellate Courts, 300 Dexter Avenue, Montgomery, Alabama 36104-3741 ((334) 229-0650), of any typographical or other errors, in order that corrections may be made before the opinion is published in **Southern Reporter**.

# ALABAMA COURT OF CIVIL APPEALS

## SPECIAL TERM, 2025

_____

### CL-2025-0040

_____

**Anthony Bone**

**v.**

**Elizabeth Delane Taylor**

**Appeal from St. Clair Circuit Court**
**(CV-23-900030)**

EDWARDS, Judge.

In February 2023, Anthony Bone filed a complaint in the St. Clair Circuit Court ("the trial court") against Elizabeth Delane Taylor, seeking damages for injuries he had sustained when he fell while at Taylor's house. In his complaint, Bone asserted claims of negligence,

recklessness, and wantonness based on allegations that Taylor had failed to warn him of the condition of the landing of the stairwell leading to her basement, which Bone, who is a plumber, had utilized to complete an inspection of a water leak in Taylor's house. Taylor later moved for a summary judgment, and Bone responded. In his response, Bone requested that the trial court postpone ruling on the motion for a summary judgment so that he could conduct additional discovery, but he did not present an affidavit in support of that request, as is required by Rule 56(f), Ala. R. Civ. P. The trial court granted Taylor's motion for a summary judgment on August 30, 2024. Bone filed a postjudgment motion, to which he attached a Rule 56(f) affidavit in support of his earlier request to postpone ruling on Taylor's summary-judgment motion pending the completion of further discovery. The trial court denied Bone's postjudgment motion, and Bone appealed.

Our review of a summary judgment is de novo; that is, we apply the same standard as was applied in the trial court. Ex parte Ballew, 771 So. 2d 1040, 1041 (Ala. 2000). Rule 56(c)(3), Ala. R. Civ. P., provides that a motion for a summary judgment is to be granted when no genuine issue of material fact exists and the moving party is entitled to a judgment as

a matter of law. Generally, a party moving for a summary judgment must make a prima facie showing "that there is no genuine issue as to any material fact and that [it] is entitled to a judgment as a matter of law." Rule 56(c)(3). If the movant meets that burden, " the burden then shifts to the nonmovant to rebut the movant's prima facie showing by presenting 'substantial evidence' to create a genuine issue of material fact." Hilliard v. City of Huntsville Elec. Utility Bd., 599 So. 2d 1108, 1110 (Ala. 1992). "[S]ubstantial evidence is evidence of such weight and quality that fair-minded persons in the exercise of impartial judgment can reasonably infer the existence of the fact sought to be proved." West v. Founders Life Assurance Co. of Florida, 547 So. 2d 870, 871 (Ala. 1989). Furthermore, when considering a motion for a summary judgment, "the court must view the evidence in the light most favorable to the nonmoving party and must resolve all reasonable doubts against the moving party." Waits v. Crown Dodge Chrysler Plymouth, Inc., 770 So. 2d 618, 618 (Ala. Civ. App. 1999).

However, when a party seeking a summary judgment bears the burden of proof at trial, like when a defendant seeks a summary judgment based upon an affirmative defense, that party

"'"must support his motion with credible evidence, using any of the material specified in Rule 56(c), [Ala.] R. Civ. P. ('pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits')."' [Ex parte General Motors Corp.,] 769 So. 2d [903,] 909 [(Ala. 1999) (quoting Berner v. Caldwell, 543 So. 2d 686, 691 (Ala. 1989) (Houston, J., concurring specially))]. '"The movant's proof must be such that he would be entitled to a directed verdict if this evidence was not controverted at trial."' Id. In other words, 'when the movant has the burden [of proof at trial], its own submissions in support of the motion must entitle it to judgment as a matter of law.' Albee Tomato, Inc. v. A.B. Shalom Produce Corp., 155 F.3d 612, 618 (2d Cir. 1998) (emphasis added)."

Denmark v. Mercantile Stores Co., 844 So. 2d 1189, 1195 (Ala. 2002); see also Pittman v. Hangout in Gulf Shores, LLC, 293 So. 3d 937, 941-42 (Ala. Civ. App. 2019).

In support of her motion for a summary judgment, Taylor presented the trial court with a transcript of her deposition, a transcript of Bone's deposition, and a copy of Bone's answers to interrogatories she had propounded. In her deposition, Taylor explained that she had noticed a leak in her upstairs-bathroom shower early on the morning of May 21, 2022; that she and her boyfriend had attempted to shut off the water to the shower but could not access the valve; and that she had contacted Bone's then employer, Roto Rooter Plumbing and Drain Service, to request plumbing services. She said that Roto Rooter had informed her

4

that a technician would arrive around noon and that she had taken no additional steps to remediate the leak pending the technician's arrival.

According to Taylor, when Bone arrived, she took him upstairs to assess the shower faucet and explained that the water was also dripping into the basement of the house. She said that, after she showed Bone the shower, she requested that he follow her back downstairs to the main level of the house and then down a second flight of stairs to the basement. Taylor reported that the stairwell to the basement had lighting at the top landing but not at the lower landing. She testified that, as one descended the basement stairwell, the stairwell terminated at a door on the left side of the stairwell, through which one would pass to enter the basement. Taylor also said that her garage doors, which led out of the basement, were open at the time Bone traversed the basement stairwell.

Taylor testified that she preceded Bone down the basement stairwell, turned the corner at the doorway, and entered the basement. Taylor indicated that she had warned Bone to "be careful" "[b]ecause you go into my garage,[1] and you make a right, [and] you go on the back side

---

[1]In her deposition, Taylor at times used the word "garage" and at other times used the word "basement." We believe that the terms refer to the same space, which, based on photographs of Taylor's house

where the water was at." She said that she had not told Bone that water was beside the doorway leading from the stairwell to the basement because, she said, the leak was not beside that doorway. She denied having seen Bone fall and said that he first told her that he had fallen via a telephone call later in the day. Taylor also denied that the basement floor had had any suds on it or that she had made any attempt to clean the water off the basement floor before Bone's arrival.

Bone testified in his deposition that he had fallen on the landing of the basement stairwell before stepping onto the basement floor; that, after he had fallen, he saw suds on the basement floor; and that he had not inspected the landing area upon which he claimed to have slipped. According to Bone, he had fallen backward onto the stairs when his foot slipped on the landing of the stairwell. He explained that, "[b]ecause it was slick[,] I couldn't stand up by picking myself back up" and that he had instead slid off the stairs onto the landing where, he said, he had spun around to his knees so that he could right himself. Bone denied that he had seen any water or moisture on the landing as he had approached

_____

contained in the record, appears to be the lower level of the structure accessible from the front of the house through double garage doors.

6

it, and, when asked if he had seen soap or suds on the landing once he got up from his fall, he answered "no." When asked directly if he "recall[ed] if there was actually soap and water on the landing at the bottom of the stairs where you slipped," he answered: "I didn't really pay attention." However, he also testified in other parts of his deposition that he had slipped in a sudsy substance on the landing and that "the whole backend" and the lower portion of his pants legs had become wet, but not soaked, when he had fallen onto the landing and/or when he had slid off of the stairs and onto his knees to right himself. When asked if he had used the handrail as he had descended the stairs, he indicated both that he had and that he had not.[2] Later, he testified that he had not been holding the handrail when he fell.

---

[2]In response to questions asked by Taylor's counsel regarding Bone's handrail use, Bone testified as follows:

"Q: Were you holding the handrail?

"A. To my knowledge, I was.

"Q: You were holding the handrail when your foot slipped?

"A. I don't think so."

Bone described the basement stairwell as both "dark" and "dim," said that "[t]he natural lighting from inside is what pretty much lit up the home," and explained that the light tapered off as you descended into the basement stairwell. He said that it was not "pitch black, but it was -- there was not much lighting." He said that the garage doors to the basement had not been open but indicated that some light was emitted through them, which, he said, had permitted him to see the suds on the basement floor after he fell and was on his knees attempting to right himself after the fall.

According to Bone, after he had fallen, Taylor had told him to be careful and that the floor was slippery. He also indicated that Taylor had informed him that "[s]he had been trying to clean up all the water down [t]here." Bone said that he was wearing rubber-soled work shoes on the day of the accident and that he had used those same shoes both before and after the accident. Bone admitted that, as a plumber, he was aware that he would likely encounter water-covered surfaces. However, he testified that he had not been trained to expect soap or a suds-producing

When describing how he fell, Bone explained: "Because I was trying to -- as my -- you know, put my right foot, hand's off the rail, I start[ed] to slip."

8

substance on the floor and that he had not previously "encountered standing water mixed with any other sort of substance." When asked to describe the difference between walking on a water-covered surface and walking on the basement-stairwell landing at Taylor's house, he said: "In a normal scenario, it's like there's no water at all. On [Taylor's basement-stairwell landing], it's like an ice[-]skating rink."

In his answers to interrogatories posed by Taylor, Bone stated that he had been sent by his employer to Taylor's house to find the source of a water leak. He also stated that, "[a]s soon as he stepped onto the basement floor, he was caused to immediately slip and fall onto the stairs"; that, after he fell, Taylor had "let him know the floor was slippery"; and that, after he fell, he had "noticed Taylor's floor was covered with water and soap." He also stated that he had seen "two empty gallons of mold and mildew cleaner near Taylor's laundry area." Bone further asserted that the dangerous condition at Taylor's house was "water and soap all over without [Bone's] knowledge" and that Taylor had been aware of the dangerous condition because she had warned him of the slippery condition after his fall.

In support of his response in opposition to Taylor's motion for a summary judgment, Bone attached excerpts from both his and Taylor's depositions. He also attached a copy of Taylor's answers to interrogatories that he had propounded. In those answers to interrogatories, Taylor stated that she had not witnessed Bone's fall, stated that she did not learn of Bone's fall until the following day, and denied the existence of "anything that posed a danger in the area of the stairs leading down to the basement." Taylor further stated in those interrogatory answers that "[t]he stairs were not damp or slippery. There was water on the basement floor from a broken pipe. The water was open and obvious and not in the area of the stairs."

We first dispense with Bone's argument that the trial court erred by "failing to address [his] request for additional discovery [pursuant to Rule 56(f), Ala. R. Civ. P.,] prior to entertaining [Taylor's] motion for summary judgment." Bone's brief at 24. We note that "the mere pendency of discovery does not bar the entry of a summary judgment." Reeves v. Porter, 521 So. 2d 963, 965 (Ala. 1988). Rule 56(f) provides a method by which a party may seek a continuance of the consideration of a motion for a summary judgment based on the nonmovant's need for

10

additional discovery in order to adequately respond to the motion.  See

Reeves, 521 So. 2d at 965; Wright v. State, 757 So. 2d 457, 459 (Ala. Civ.

App. 2000).  Rule 56(f) states:

> "Should it appear from the affidavits of a party opposing the motion that the party cannot, for reasons stated, present by affidavit facts essential to justify the party's opposition, the court may deny the motion for summary judgment or may order a continuance to permit affidavits to be obtained or depositions to be taken or discovery to be had or may make such other order as is just."

The rule clearly requires a party seeking to postpone a ruling on a motion

for a summary judgment in order to conduct additional discovery to

provide an affidavit in which he or she explains why the outstanding

discovery is crucial to his or her case.  Moreover, our supreme court has

reiterated that "[t]he burden is on the nonmoving party to comply with

Rule 56(f), or to otherwise prove that the matter sought by discovery is

or may be crucial to the nonmoving party's case."  Reeves, 521 So. 2d at

965 (emphasis added).

As noted, in his response in opposition to the motion for a summary

judgment, Bone failed to provide the trial court a Rule 56(f) affidavit in

support of his request to postpone ruling on the summary-judgment

motion.  Instead, Bone waited to file a Rule 56(f) affidavit until after the

trial court had entered a summary judgment in favor of Taylor. Relying on the trial court's discretion to consider affidavits filed less than two days before the date of the summary-judgment hearing, see Rule 56(c)(2), Ala. R. Civ. P. ("Subject to [Rule 56](f) …, any statement or affidavit in opposition shall be served at least two (2) days prior to the hearing."); Middaugh v. City of Montgomery, 621 So. 2d 275, 279 (Ala. 1993) ("Rule 6(d), A[la]. R. Civ. P., allows the trial court discretion to permit the service of affidavits that might otherwise be untimely, and its decision to accept such affidavits will not be reversed absent an abuse of discretion."), Bone contends that the trial court abused its discretion by failing to consider his tardy Rule 56(f) affidavit and, apparently, by failing to set aside the summary judgment and to permit additional discovery.

By its very language, Rule 56(f) clearly requires submission of the required affidavit before the entry of an order granting a summary-judgment motion so that the trial court may determine whether it is appropriate to deny the motion or to continue its consideration of the motion pending further discovery. The law is clear that a party cannot use a postjudgment motion to belatedly submit evidence in response to a

12

motion for a summary judgment after the entry of an order granting the summary-judgment motion. See Preferred Research, Inc. v. First American Title Ins. Co., 627 So. 2d 861, 863 (Ala. 1993); Moore v. Glover, 501 So. 2d 1187, 1189 (Ala. 1986). Thus, it seems reasonable to reject the proposition that a party may use a postjudgment motion combined with a Rule 56(f) affidavit as a method for seeking to vacate an order granting a summary-judgment motion so that the party may conduct further discovery and even more belatedly submit the evidence that it lacked when the summary judgment was initially entered. We find no basis to reverse the trial court's summary judgment in favor of Taylor based on Bone's tardy attempt to comply with Rule 56(f).

Bone further contends that Taylor did not meet her burden of establishing that no genuine issue of material fact existed such that she was entitled to a summary judgment and specifically argues that the conflicting evidence relating to the circumstances of his fall created genuine issues of material fact for resolution by a jury. He points out that his testimony indicated that he had traversed a poorly lit basement stairwell, that he had slipped on a slippery landing at the bottom of that basement stairwell, that he had observed water and suds on the adjacent

basement floor, that he had encountered difficulty righting himself after he fell because of the slipperiness of the landing, and that the backside of his pants and his pants legs were wet or damp after he righted himself from the fall. Although he admits that he testified that, as a plumber, he knew to exercise caution and was aware that he might encounter wet flooring, he contends that, as he also testified, he was not aware that he might encounter water combined with a soapy or slippery substance like what he encountered on the landing of Taylor's basement stairwell.

In its judgment, the trial court relied on South Alabama Brick Co. v. Carwie, 214 So. 3d 1169, 1175-76 (Ala. 2016), to conclude that Taylor owed no duty to warn Bone of the condition of the basement stairwell. Specifically, the trial court quoted the following sentence from Carwie: "'"There is no duty to warn' ... an independent contractor 'who has equal or superior knowledge of a potential danger.'"'" 214 So. 3d at 1176 (quoting Roberts v. NASCO Equip. Co., 986 So. 2d 379, 383-84 (Ala. 2007), quoting in turn Fielder v. USX Corp., 726 So. 2d 647, 650 (Ala. 1998), quoting in turn Alabama Power Co. v. Williams, 570 So. 2d 589, 592 (Ala. 1990)) (emphasis omitted). The trial court concluded that Bone had "equal or superior knowledge of [the] potential danger" posed by the

14

basement-stairwell landing because, it said, "[a]s a plumber, Bone was aware of the potential dangers of slipping when repairing water leaks."

A closer examination of <u>Carwie</u> is warranted. The facts of <u>Carwie</u> are markedly different than those presented in this appeal. The appeal in <u>Carwie</u> was brought by South Alabama Brick Co., Inc., d/b/a Riley-Stuart Supply Co. ("SAB"), which was the owner of a warehouse at which Benito Perez was catastrophically injured when he fell through a skylight while making repairs to the roof of that warehouse; Gregory Carwie was Benito Perez's temporary conservator, who had sued SAB and had secured a judgment of over $12 million against SAB. 214 So. 3d at 1171. SAB had contracted with Cooner Roofing and Construction, Inc. ("Cooner Roofing"), to repair the roof of the warehouse. <u>Id.</u> The record reflected that Cooner Roofing utilized temporary employees or subcontractors to perform its roofing work. <u>Id.</u> at 1172. Benito Perez was a member of a local "crew" that Cooner Roofing had hired to complete the roofing repairs required on the warehouse owned by SAB; the crew "foreman," Rocael Perez, testified that the members of his "crew" were not his employees. <u>Id.</u> The owner of Cooner Roofing, Bobby Cooner, testified that he had warned Rocael Perez and his crew that the areas of the roof around the

15

skylights could be dangerous and had instructed Rocael Perez to follow appropriate fall safeguards set forth in regulations promulgated by the Occupational Health and Safety Administration. Id. Rocael Perez denied that Cooner had told him about the dangers posed by the skylights or that he had instructed him to follow any particular safety regulations. Id. at 1173. He further testified, as did another member of the crew, Byron Perez, that the skylights, which were flush with the rooftop, were old and discolored and were not easily distinguished from the surface of the roof itself. Id. Carwie also presented expert testimony indicating that the danger presented by the skylights was not open and obvious. Id.

Before the trial court, SAB argued that it was not liable to Benito Perez because Cooner Roofing had had superior knowledge regarding the condition of the roof and the dangers presented by the skylights and that Cooner Roofing, as Benito Perez's employer, had had the duty to warn Benito Perez of the dangers of the skylights. Id. at 1174. The trial court rejected that argument, but our supreme court did not. The Carwie court first set out the general law regarding the duty owed by a premises owner to a person on his or her property.

> "A premises owner's legal duty to a party injured by a
> condition of the premises depends upon the legal status of the

injured party. <u>Galaxy Cable, Inc. v. Davis</u>, 58 So. 3d 93, 98 (Ala. 2010). In this case, Benito Perez was on SAB's premises to confer a material or commercial benefit to SAB. Accordingly, the relationship between SAB, the premises owner, and Benito Perez, a roofer, is that of invitor/invitee. See <u>Ex parte Mountain Top Indoor Flea Mkt., Inc.,</u> 699 So. 2d 158, 161 (Ala. 1997) ('"In order to be considered an invitee, the plaintiff must have been on the premises for some purpose that materially or commercially benefited the owner or occupier of the premises."' (quoting <u>Sisk v. Heil Co.,</u> 639 So. 2d 1363, 1365 (Ala. 1994))).

"Alabama law is well-settled regarding the scope of the duty an invitor owes a business invitee. 'The owner of premises owes a duty to business invitees to use reasonable care and diligence to keep the premises in a safe condition, or, if the premises are in a dangerous condition, to give <u>sufficient warning so that, by the use of ordinary care, the danger can be avoided</u>.' <u>Armstrong v. Georgia Marble Co.,</u> 575 So. 2d 1051, 1053 (Ala. 1991) (emphasis added). We have said that a premises owner's duty to warn extends only to 'hidden defects and dangers that are known to [the premises owner], but that are unknown or hidden to the invitee.' <u>Raspilair v. Bruno's Food Stores, Inc.,</u> 514 So. 2d 1022, 1024 (Ala. 1987). More specifically, we have explained that a plaintiff must establish '"(1) that the defect or danger was 'hidden'; (2) that it was 'known to the owner'; and (3) that it was 'neither known to the contractor, <u>nor such as he ought to know</u>.'"' <u>Roberts v. NASCO Equip. Co.,</u> 986 So. 2d 379, 384 (Ala. 2007) (quoting <u>Ex parte Meadowcraft Indus., Inc.,</u> 817 So. 2d 702, 706 (Ala. 2001), quoting in turn <u>Glenn v. United States Steel Corp.,</u> 423 So. 2d 152, 154 (Ala. 1982)).

"'In discussing a premises owner's liability towards an independent contractor, this Court has recognized that an "'"owner of premises is not responsible to an independent contractor for injury

from defects or dangers which the contractor knows of, or <u>ought to know of</u>."'"'

"986 So. 2d at 383 (quoting <u>Veal v. Phillips</u>, 285 Ala. 655, 657-58, 235 So. 2d 799, 802 (1970)). See also <u>Quillen v. Quillen</u>, 388 So. 2d 985, 989 (Ala. 1980) (to the same effect).

"This Court has elaborated on the nature of a premises owner's duty to a business invitee as follows:

"'"'"The duty to keep an area safe for invitees is limited to hidden defects which are not known to the invitee and would not be <u>discovered by him in the exercise of ordinary care</u>. All ordinary risks present are assumed by the invitee, and the [invitor] is under no duty to alter the premises so as to [alleviate] known and obvious dangers. The [invitor] is not liable to an invitee for an injury resulting from a danger that was obvious or that <u>should have been observed in the exercise of reasonable care</u>."'"'

"<u>Jones Food Co. v. Shipman</u>, 981 So. 2d 355, 362 (Ala. 2006) (quoting <u>Sessions v. Nonnenmann</u>, 842 So. 2d 649, 651-52 (Ala. 2002), quoting in turn <u>Breeden v. Hardy Corp.</u>, 562 So. 2d 159, 160 (1990) (bracketed language in original; some emphasis omitted)). Of particular importance to this case, the Court in <u>Jones Food</u> then stated:

18

"'"'"The entire basis of an invitor's liability rests upon his superior knowledge of the danger that causes the invitee's injuries. If that superior knowledge is lacking, as when the danger is obvious, the invitor cannot be liable."'"'

"981 So. 2d at 362 (quoting Sessions v. Nonnenmann, 842 So. 2d at 651-52, quoting in turn Breeden v. Hardy Corp., 562 So. 2d at 160 (emphasis added)). And as to an independent contractor in particular, we have explained: '"'There is no duty to warn' ... an independent contractor 'who has equal or superior knowledge of a potential danger.'"' Roberts, 986 So. 2d at 383-84 (quoting Fielder v. USX Corp., 726 So. 2d 647, 650 (Ala. 1998), quoting in turn Alabama Power Co. v. Williams, 570 So. 2d 589, 592 (Ala. 1990) (emphasis added))."

Carwie, 214 So. 3d at 1175-76.

The Carwie court elaborated on what it referred to as "the 'no-duty' rule applicable to a premises owner that lacks 'superior knowledge' of a danger," id. at 1177, stating:

"'Th[e] absence of duty is commonly referred to as the "no duty" rule and has been thoroughly discussed in 65 C.J.S. Negligence § 63(53), at pages 764-68, as follows:

"'"....

"'"The basis of the inviter's liability for injuries sustained by the

19

> invitee on the premises rests on the owner's superior knowledge of the danger, and, as a general rule, he is not liable for an injury to an invitee resulting from a danger which was known to the invitee or which was obvious or should have been observed by the invitee in the exercise of reasonable care, or from a condition which was as well known or as obvious to the invitee as to the inviter, or from a danger which the invitee should reasonably have appreciated before exposing himself to it, or which the inviter had no reason to believe would not be discovered by the invitee." ' "

Id. (quoting Gray v. Mobile Greyhound Park, Ltd., 370 So. 2d 1384, 1388 (Ala. 1979)).

According to the Carwie court, the issue posed in that appeal was not "whether the danger posed by the skylights was open and obvious to Benito Perez," but

> "whether … it was reasonable for SAB to expect that its independent contractor, Cooner Roofing, had knowledge equal or superior to that of SAB as to the danger that would be posed if an employee of Cooner Roofing were to fall from an elevated position onto one of the skylights on the flat area of the roof."

Id. The supreme court then explained that "[t]he existence of a duty on the part of a premises owner to an employee of [a] contractor depends, then, on what information the premises owner reasonably could have

20

expected that contractor to have known and acted upon." Id. The

supreme court concluded that

"[w]here a premises owner can reasonably expect that its contractor knows as much [as] or more than the premises owner does regarding a dangerous condition -- whether this is so because the danger is open and obvious to anyone, because the owner has told the contractor all it knows, or because of the contractor's expertise and previous experience on the premises -- the superiority-of-knowledge test is not met and the premises owner has no further duty to warn the contractor."

Id.

Carwie is clearly distinguishable on its facts, which concern the

employee of a contractor on the premises of a commercial business;

however, it is one of the most recent restatements of the "no-duty" rule

and the authority upon which the trial court based its summary

judgment in favor of Taylor. Based on the discussion quoted above, it is

apparent that the "no-duty rule" is not a rule peculiarly applicable only

to independent contractors but, instead, is simply the application of the

normal rule of premises liability when the plaintiff is an invitee. Of

critical importance is whether the independent contractor, who is still an

invitee, has knowledge equal to or superior than that of the premises

owner regarding the allegedly dangerous condition.

21

In order for Taylor to be entitled to a summary judgment in her favor, the record must contain undisputed evidence demonstrating that Bone's knowledge of the slippery condition of the stairwell landing was, or ought to have been, equal or superior to hers. According to the discussion in <u>Carwie</u>, Taylor could have met her burden by presenting evidence demonstrating that either "the danger [was] open and obvious to anyone, [or that she] ha[d] told [Bone] all [she] kn[ew], or that [Bone should have known of the condition of the basement-stairwell landing based on his] expertise and previous experience on the premises."[3] 214 So. 3d at 1178. Taylor contends that she met her burden by presenting Bone's testimony indicating that, as a plumber, he knew to be cautious and to expect water-covered surfaces when inspecting premises for a water leak. However, despite Bone's admission that he knew to be aware of the potential for water underfoot while performing his duties as a plumber, Bone's other testimony indicates that he was told that the water was leaking <u>in the basement</u>, not in the stairwell, so Bone had no reason to suspect that the basement-stairwell landing, which was separated

---

[3]The fact that Bone had never before been to Taylor's house appears to be undisputed.

from the basement by a door, would be covered in water. Similarly, Taylor's answers to interrogatories indicate that the water leak was not located near the basement stairwell. Moreover, Bone testified that the stairwell landing was not merely wet but also slippery because of the additional presence of either soap or another suds-producing substance, which Bone testified he had not been trained to anticipate and had not before encountered. Taylor presented no evidence tending to establish that Bone should have expected to encounter a slippery, sudsy substance on the landing of the basement stairwell merely because he was a plumber.[4] Thus, the evidence before the trial court created a fact question regarding whether Bone, by virtue of his occupation as a plumber, ought to have known that the basement-stairwell landing might be covered not only in standing water but also in water mixed with a suds-producing substance that made the landing slippery.

---

[4]We recognize that Taylor refuted Bone's testimony regarding the presence of soap or another suds-producing substance in the basement or on the stairwell landing. However, we view the evidence in the light most favorable to Bone, the nonmovant, Waits, 770 So. 2d at 618, and we note that the conflict in the evidence creates an issue of fact relating to the composition of the substance that Bone allegedly encountered.

Insofar as Taylor asserts that the danger posed by any water or substance on the basement-stairwell landing was open and obvious, Bone's testimony that the stairwell was not well lit, combined with Taylor's admission that the light in the stairwell was located at the top of the landing, tends to negate the ability Bone would have had to observe the condition of the stairwell landing as he traversed the stairs.[5]  See Byrne v. Fisk, 385 So. 3d 973, 985-87 (Ala. 2023) (discussing whether darkness or dim lighting is sufficient to establish the open-and-obvious defense to a premises-liability claim).  Our supreme court has explained that

> "[p]artial or poor light … could mislead a reasonably prudent person into thinking that he or she would be able to see and to avoid any hazards. The variable factors which make openness-and-obviousness under partial or poor light conditions a fact question not appropriate for resolution by summary judgment are direction, level, color, diffusion, shadows, and like qualities of light, as well as the other physical features of the scene."

---

[5]We recognize that Taylor testified that the garage doors were open, but we must view the evidence in the light most favorable to Bone, Waits, 770 So. 2d at 618, and the conflict in the evidence relating to the lighting in the stairwell at the time that Bone fell creates a genuine issue of material fact.

24

Ex parte Kraatz, 775 So. 2d 801, 804 (Ala. 2000); see also Ex parte Schaeffel, 874 So. 2d 493, 496 (Ala. 2003) (explaining that, unlike darkness, "dim light is light sufficient to make one believe that he can sufficiently see and identify dangers, but in reality he cannot properly make such identifications"). If a jury were to resolve the conflicts in the evidence favorably to Bone and determine that the stairwell was dimly lit, a jury could reasonably infer that Bone might have believed that he could see the basement stairwell clearly enough to safely traverse it but that he was, in actuality, unable to observe the condition of the basement-stairwell landing such that it would have been obvious to him that the landing was wet or covered with a slippery or sudsy substance. See Byrne, 385 So. 3d at 987. Thus, we cannot agree that the evidence establishes, as a matter of law, that the condition of the basement-stairwell landing was open and obvious.

The trial court also stated in its judgment that Bone "did not submit substantial evidence that the stairw[ell] landing ... had a foreign substance on it[] or that Taylor was aware of any hidden danger."[6] Bone

---

[6]The trial court also stated that Bone had not submitted substantial evidence indicating that the stairwell landing was "dangerous." Bone never asserted that the stairwell landing was, in and of itself, dangerous

25

testified that he slipped on a slippery or slick substance, that the backside and lower legs of his pants were "wet" or dampened when he arose from the stairwell landing, and that he had observed suds on the basement floor. Testimony indicating that a person found his or her clothing to be wet after a slip and fall is sufficient evidence to support an inference that the person slipped on standing water or a wet substance and creates a genuine issue of material fact regarding the cause of the fall. Cox v. Western Supermarkets, Inc., 557 So. 2d 831, 831 (Ala. 1989) (stating that plaintiff had not seen water on the floor before she fell but "felt a small wet spot on the right seat of her pants" after she fell); Nelson v. Delchamps, Inc., 699 So. 2d 1259, 1261 (Ala. Civ. App. 1997) (stating that plaintiff testified that, after she fell, "her pants leg was damp and dirty and that the bottom of her shoe was damp with a clear liquid").

Bone also testified that Taylor had warned him, albeit after he fell, that the area might be slippery and had told him that she had attempted to clean the area; Taylor herself admitted that she had warned Bone that the floor might be slippery as he traversed the stairwell. See Nelson, 699

---

or defective, and we therefore agree that Bone did not present such evidence.

So. 2d at 1261 (finding a genuine issue of material fact was created by, among other things, evidence indicating that "a store employee began mopping the floor where [the plaintiff] had fallen and that the employee told [the plaintiff] that 'there was something damp here on the floor,' and 'that could have been what caused you to fall'"). Thus, the record contains some evidence indicating that Taylor was aware that the basement-stairwell landing was slippery. That evidence, coupled with evidence indicating that the area was not well lit such that Bone may have been prevented from observing the condition of the basement-stairwell landing, could support an inference by a jury that Taylor was aware of the condition of the basement-stairwell landing, which condition was not readily apparent to Bone.

Based on the foregoing, we reverse the judgment entered on Bone's negligence claim against Taylor, and we remand the cause for proceedings consistent with this opinion. Bone does not, however, assert any arguments for reversal of the judgment insofar as that judgment terminated his claims against Taylor based on his allegations of recklessness and wantonness. We therefore consider Bone to have abandoned those claims, and we do not address the judgment insofar as

it concluded the litigation of those claims. <u>See</u> <u>Moore v. Prudential Residential Servs. Ltd. P'ship</u>, 849 So. 2d 914, 923 (Ala. 2002) (explaining that an appellant's failure to address an issue in his or her brief results in a waiver of the omitted issue on appeal); <u>Canyon Dev. Co. v. Holcomb Storage</u>, 107 So. 3d 1096, 1103 (Ala. Civ. App. 2012) (concluding that the failure of the appellants to make an "argument regarding the wilfulness/wantonness claims in their brief" amounted to a waiver of those issues on appeal).

REVERSED AND REMANDED.

Moore, P.J., and Hanson, Fridy, and Bowden, JJ., concur.