COBB, Chief Justice.
 

 Veronica D. Giles seeks the reversal of a summary judgment entered by the Jefferson Circuit Court on her claims alleging medical malpractice, failure to obtain informed consent, and spoliation of evidence against Brookwood Health Services, Inc. (“Brookwood”), the entity that operates Brookwood Medical Center, Dr. Jon Ad-cock, Dr. C. Paul Perry, and OB-GYN South, P.C. (“OB-GYN South”). We affirm.
 

 Facts
 

 A. Giles’s medical history, the surgical procedure, and the subsequent medical treatment
 

 In July 2001 Giles visited Advocate South Suburban Hospital in Chicago, Illinois, where an ultrasound was performed on her pelvis. The following note is contained in that ultrasound report:
 

 “There is a mild solid enlargement of the left adnexal area measuring 4.5 cm and probably due to a hemorrhagic cyst, endometrioma, or malignancy. Gynecological consult recommended. ... The right adnexum[
 
 1
 
 ] is not remarkable.”
 

 
 *538
 
 On August 28, 2001, Giles was seen by Dr. Adcock, a gynecologist with OB-GYN South. At Dr. Adcock’s office Giles underwent another ultrasound. The second ultrasound report states that the “[ultrasound revealed left ovarian complex mass. ... Right ovary is normal.”
 

 Dr. Adcock’s notes regarding Giles’s August 28, 2001, visit state that Giles
 

 “presented to [Dr. Adcock] with pain in her ovaries. An ultrasound revealed an ovarian mass. She is status-post hysterectomy. ... She states that she feels a yanking feeling that comes and goes. It is increasing [in] frequency. She has felt it twice in the last two weeks. The left side is greater than the right.”
 

 At the conclusion of the notes for the August 28 visit, Dr. Adcock wrote that his “assessment” was “[l]eft ovarian complex mass that is persistent and recurrent with pain.” He described his “plan” as follows: “We will proceed with diagnostic laparos-copy and probable left oophorectomy.”
 

 The procedure was scheduled; an “O.R. Journal” note in the record indicates that a request was made on August 28, 2001, to schedule an operating room at Brookwood Medical Center for a “left oophorectomy” for Giles.
 
 [2]
 
 However, Giles’s insurance company would not agree to pay for the procedure, and the procedure did not go forward as originally scheduled.
 

 On October 3, 2001, Giles consulted another doctor, Dr. Emig,
 
 [3]
 
 who practiced at a different clinic than Dr. Adcock. Dr. Emig’s notes from Giles’s October 3 visit to Dr. Emig’s office state:
 

 “The patient had an [ultrasound] today to reevaluate her left adnexa. [Ultrasound] revealed a persistent complex left ovarian cyst.... Her records from Dr. Adcock in Brookwood were reviewed and this cyst is consistent with measurements of a complex left ovarian cyst obtained in his office in August of 2001. The patient reported that she was essentially pain-free at the time she saw me on September 21st, but since then has had some intermittent pain on her left side. ... We plan to schedule an operative lap with possible left ovarian cystec-tomy in November.”
 

 On October 31, 2001, Giles returned to Dr. Adcock for another appointment. On this date, she had another ultrasound, which indicated that the left ovarian mass had increased slightly in size since the August 28, 2001, ultrasound. The October 31, 2001, ultrasound report indicated “0” adnexal masses on the right side.
 

 At 5:32 p.m. on November 6, 2001, Dr. Adcock dictated the following notes:
 

 “Veronica [Giles] is a 45-year-old married female, para 2-0-0-2 who came to me in August noting to have a complex ovarian cyst. She is status post hysterectomy in the past. She denies any significant complaints other than some mild pain in that area. An ultrasound in August revealed a complex cyst measuring 3.2 x 2.6 x 2.9 and follow-up two months later revealed a slightly enlarged ovarian cyst with continued complexity. She was unable to proceed with surgery at the time of evaluation due to the fact that her insurance would not
 
 *539
 
 pay. She has no other GYN complaints ....
 

 “PAST SURGICAL HISTORY: Cesarean section X2 and hysterectomy in 1995.
 

 “PHYSICAL EXAMINATION: .... Tender in the left adnexa — greater than right....
 

 “ULTRASOUND: Revealed the above noted complex ovarian cyst.
 

 “IMPRESSION:
 

 1. Complex ovarian cyst that is persistent.
 

 “PLAN
 

 1. laparoscopic bilateral salpingo-ooph-orectomy on 11/7/01.”
 

 “Pre-admit” orders sent to Brookwood from Dr. Adcock’s office requested a permit for “L[eft] oophorectomy” and listed “complex ovarian mass” as the diagnosis. However, the words “L[eft] oophorectomy” on those orders were crossed out and underneath them were written the words “Right oophorectomy B.G.” Bonnie Green, a Brookwood nurse, stated in her deposition that she was the person who revised the order. Nurse Green stated that she believed she changed the order at Dr. Adcock’s direction after she consulted him in an effort to resolve the fact that the order for a “left oophorectomy” differed from Dr. Adcock’s November 6, 2001, notes indicating a planned “laparoscopic bilateral salpingo-oophorectomy.” However, under oath, Dr. Adcock denied that he told Nurse Green to change the pre-admit orders from “L[eft] oophorectomy” to “Right oophorectomy” or that he knew anything about how or why the pre-admit orders were changed.
 

 A Brookwood “pre-anaesthetic interview” form indicates that, on November 6, 2001, a nurse interviewed Giles in preparation for a “L[ef]t oophorectomy.”
 

 On November 7, 2001, Giles went to Brookwood Medical Center for the surgery. At 8:50 a.m. on November 7, 2001, Giles signed a “Consent for Surgery and/or Anesthetics or Special Diagnostic or Therapeutic Procedures,” which included the following language:
 

 “Your doctor has recommended the following operation or procedure: Laparo-scopic Right Oophorectomy. By signing this form you authorize and consent to this operation or procedure. You also agree and consent to the administration of such anaesthesia, monitoring, venous, and arterial access as your doctor(s) deem necessary for the operation or procedure. The operation or procedures will be performed by your doctor(s) Ad-cock and with assistants he/she selects.
 

 ... Any different or further procedures, which in the opinion of your doctor may be indicated due to any emergency, may be performed on you. During the course of the procedure, unforseen conditions may be revealed that necessitate the extension of the original procedure(s) than those explained to you by your doctor [sic]. By signing this form, you, therefore, authorize and request that your doctor, his/her assistants or his/her associates perform such surgical or other procedures as are necessary and desirable in the exercise of his/her or their professional judgement and do hereby grant authority to your doctors to treat all conditions which may require treatment although such condition may not be discovered until after the operation or procedure is commenced.”
 

 According to Dr. Adcock’s deposition testimony, on the morning of the operation, he discussed with Giles the scope of the operation and the risks involved and the possibility that he would remove either or both ovaries during the operation. Giles testified in her deposition that she
 
 *540
 
 did not recall the substance of her conversations with Dr. Adcock that morning.
 

 By 9:04 a.m. on November 7, 2001, Giles was in the operating room undergoing the operation. Dr. Perry, another gynecologist with OB-GYN South, assisted Dr. Ad-cock with the surgery. The surgery was videotaped.
 

 The surgery was completed by 12:00 p.m. on November 7, 2001. A handwritten “Post Operative Note” by Dr. Adcock dated November 7, 2001, at 12:00 p.m. states that Dr. Adcock’s “Pre-Op diagnosis” was “R[ight] complex ovarian cyst,” and that his “Post Op Diagnoses” were the “SAME” and, in addition, “severe adhesive disease.” The postoperative note listed “bowel laceration” as a complication resulting from the procedure.
 

 Giles’s husband later signed a sworn affidavit in which he recounted the events related to Giles’s treatment and surgery as follows:
 

 “My name is Edward Giles and I am the husband of Veronica Giles. This affidavit is given based on my personal knowledge of the event that took place prior to and after her admission to Brookwood Hospital for surgery on November 7, 2001. I accompanied [m]y wife to Defendant, [Brookwood], on November 7, 2001. I went into the prep room with her for one day surgery. I talked with two ladies who were dressed in hospital nursing and/or anesthesia attire. I told them to tell the doctor that the left ovary was to be removed because the male anesthesiologist person talking to my wife indicated that the right ovary was to be removed. I told them to take good care of my wife and they assured me they would.
 

 “Two and one half (2½) hours later, a nurse notified me in the waiting area that there was [a] phone call for me. The nurse on the phone notified me that the doctor wanted to inform me that it may take a little longer to finish because my wife has a lot of scar tissue, and to please be patient and don’t worry.
 

 “One and one half (1⅜) hours later, Dr. Adcock came to the lobby of the waiting room and advised me that the procedure went okay, but scar tissue gave him a bit of a problem, and that her bowel has a small abrasion — nothing serious or to worry about. I asked the doctor, ‘Did you make sure you took out the left ovary on the left side[?’] He said, ‘No, I took out the ovary on the right side[.’] He asked me ‘are you sure, because I remember the right side’; he said he [ ]would check and get back to me.
 

 “One (1) hour later. Dr. Adcock returned to the lobby waiting room and stated that I was absolutely right, that it was the left side that should have been removed. 1 am so sorry Mr. Giles, could you please come into this room so I may speak with you[.’] We went into a small area, a private room that was located near the lobby waiting area. Dr. Adcock stated[,] T am truly sorry, I am so sorry.’ He stated that he was thinking of our talks in the office and he took for granted that it was the right when he saw all of the scar tissue, that the right was the correct ovary to take out, and your wife pointed to the right side just before the surgery. I advised Dr. Adcock that she was in a nervous and/or sedated state of mind, and that I asked the nurses to tell you to check your records before beginning surgery, because the male anesthesiologist that was in the room indicated that you were scheduled to remove the right. I asked Dr. Adcock, how could that be right that the right ovary was removed? He stated that he just took it for granted that the right ovary was the correct one.
 
 *541
 
 Dr. Adcock advised me that he forgot to look at the charts or his notes before starting the surgery. He stated that he remembered after I mentioned the left ovary, he stated again, ‘Mr. Giles, I am so sorry ... we can always go back after maybe four to six weeks to get the correct one, I did see some growth on the right ovary that we took out.[’]
 

 “I asked him to please help to get my wife well so we could go home; he stated that he would like to keep her overnight for observation, because of the scar tissue. I said okay. Dr. Adcock said that he had a taping of the procedure and that he would give it to me. He did give it to me. He stated that he would tell my wife of the mistake about the ovary when she was in her room. My wife was moved to room 324 on November 7th.
 

 “On that evening of November 7th, Dr. Adcock came to our room and sat on the bed and told my wife that he took out the wrong ovary and how very sorry he was. He advised her that down the road, we could go back for the correct ovary (left) in maybe four to six weeks, depending on how she felt about it later. He told her that he and Dr. Perry performed the surgery and that Dr. Perry would be up to the room later to see her.
 

 “The next day, November 8th, Dr. Adcock had the head doctor stop in to see us. I do not recall his name. Dr. Adcock also at that time asked for the tape back so that the chief administrator could look at it. He stated that he would return it. I gave him the tape he had previously given me which I had not had an opportunity to view. Dr. Adcock later returned a tape to me and in viewing the tape of two to three minutes of video and after that there appears to be twenty to thirty minutes edited or erased and then a thirty (30) to forty-five (45) second closing. The tape appears to have been changed.
 

 “Dr. Perry did come to see my wife. He never mentioned anything about the fact that the incorrect ovary was removed during the surgery ... that he and Dr. Adcock performed. He kept his conversation focused on her condition and when she might be able to go home. Dr. Adcock mentioned that he has to go out of town and would be leaving on Friday, November 9th, and that Dr. Perry would stop by and keep [a] check on my wife for him. My wife was released from the hospital on November 9th. At the time of my wife’s release, she was running a fever. Dr. Perry advised us that unless it got above 104 degrees to not worry. She later developed] peritonitis and required three surgeries to correct a perforation of the bowel which Dr. Adcock said occurred and they had taken care of by sewing it up.”
 

 During Dr. Adcock’s deposition, Dr. Ad-cock confirmed many of the details set out in Mr. Giles’s affidavit, but he denied that he had told Mr. Giles that he had removed the wrong ovary or that he had apologized for removing the wrong ovary.
 

 Around 5:00 p.m. on November 7, Dr. Adcock made the following note:
 

 “P[atien]t alert & awake. Discussed the surgery — pre op diagnosis was a Left ovarian mass but the surgery that took place was a Right S & O. Extensive adhesions discussed and inability to even visualize the left adnexa. P[atien]t’s husband is aware of this, and was present for conversation.”
 

 Dr. Adcock dictated further notes at 5:31 p.m. on November 7 as follows:
 

 “PREOPERATIVE DIAGNOSIS: LEFT COMPLEX OVARIAN MASS
 
 *542
 
 “POSTOPERATIVE DIAGNOSIS: SAME PLUS EXTENSIVE PELVIC AND ABDOMINAL ADHESION DISEASE AND RIGHT OVARIAN MASS “OPERATION:
 

 LAPAROSCOPIC RIGHT SALPINGO-OOPHORECTOMY EXTENSIVE ADHESIOLYSIS CYSTOSCOPY....
 

 “COMPLICATIONS: Inability to remove left adnexa.
 

 [[Image here]]
 

 “FINDINGS: Extensive bowel to abdomen adhesions as well as bladder to abdominal wall adhesions. Left tube and ovary completely covered by adhe-sions. Right tube and ovary somewhat freer but still adherent to the midline and lateral wall as well as abdominal wall. Cystoscopy findings revealed bilaterally functioning ureters. “INDICATIONS: 45 year old married black female status post hysterectomy in the past with persistent complex left ovarian cyst that was essentially stable in size. Recommended operative removal. Patient was counseled regarding the risks and benefits of the procedure including bowel, bladder injury, infection and bleeding. She desired to proceed. “OPERATIVE PROCEDURE: The patient was taken to the operating Room where general anesthesia was obtained without difficulty. She was then prepped and draped in the normal sterile fashion. ... A left upper quadrant incision was used due to the previous incisions. ... We were then able to only visualize right lateral, extreme lateral and left extreme lateral abdominal walls. ... We were unable to visualize the left adnexa at all due to adhesions. The right adnexa was visualized and there appeared to be a right ovarian enlargement and probable mass. We proceeded with very careful sharp dissection, coagulating as we went, noting to be away from bowel and bladder. ... We were careful not to leave any ovarian capsule on the right side. We ... were able to ... complete the right salpingo-oophorectomy. ... We did oversew one area near the bowel that was abraded. ... The patient tolerated the procedure well and was sent to the Recovery Room in satisfactory condition. She will stay 23 hour observation due to the extensive adhesiolysis. The patient’s husband was informed of the above findings and that we failed to remove the previously noted diseased ovary but did remove the other ovary. He voiced understanding.”
 

 On November 8, 2001, Dr. Donald R. Simmons of Cunningham Pathology, P.C., signed a “Surgical Pathology Report” regarding Giles’s right ovary and fallopian tube. The report states:
 

 “FINAL DIAGNOSIS:
 

 Fallopian tube and ovary, right:
 

 -No pathologic abnormality. ...
 

 “GROSS DESCRIPTION:
 

 Received labeled ‘right ovary and tube’ is a somewhat fragmented apparent tubo-ovarian complex in which the tissue overall measures 5 x 3 x 2.5 cm. Cut section demonstrates no gross abnormalities. ...
 

 “MICROSCOPIC DESCRIPTION:
 

 Sections of fallopian tube and ovary demonstrate normal physiologic structures with no evidence of neoplasia. There is a cyst with old hemorrhage and no residual lining epithelium. No diagnostic endometriosis is identified.”
 

 On November 9, 2001, Dr. Perry dictated the following “Discharge Summary,” which Dr. Adcock signed:
 

 “Patient underwent right S & 0 with extensive adhesiolysis, had postoperative ileus and this has resolved over the
 
 *543
 
 course of 48 hours of hospitalization. She will be discharged on [certain medications], The patient will return to see Dr. Adcock in two weeks.”
 

 On November 13, 2001, Giles returned to Dr. Adcock complaining of severe pain, and she was dehydrated. On November 14, Giles was admitted to Brookwood Medical Center where it was discovered that her bowel had a perforation and that she had contracted peritonitis. Giles underwent several extensive surgeries and hospitalizations to treat the peritonitis.
 

 B. Testimony of Dr. Anthony DeSalvo, Giles’s medical expert
 

 In answering questions during his deposition, Giles’s medical expert, Dr. Anthony DeSalvo, described the nature of Giles’s operation as follows:
 

 “Q: And [Dr. Adcock] wrote ‘diagnostic laparoscopy and probable left oophorectomy’?
 

 “A: Yes, sir.
 

 “Q: Is that a guarantee that he is going to remove the left ovary?
 

 “A: No.
 

 “Q: Why not?
 

 “A: Because if he can’t see it, if he looks at it and it’s perfectly normal, if he doesn’t think it’s causing her symptoms.
 

 “Q: By definition, based on what we’ve talked about before, diagnostic la-paroscopy means he is going to put the laparoscope in and look and see if he can find explanations for her pain, correct?
 

 “A: Yes.
 

 “Q: He might find one explanation, he might find two, he might find more, couldn’t he?
 

 “A: Yes.
 

 “Q: All right. And ‘probable left ooph-orectomy,’ is he saying to the patient, ‘Probably we’ll remove your left ovary based on what I see going in, but I can’t guarantee it?’
 

 “A: I think that’s a fair statement.”
 

 Dr. DeSalvo further made clear in his deposition that, in his opinion, Dr. Adcock would have met the standard of care if, during the surgery, he attempted to remove the left ovary, decided not to remove that ovary due to the risks posed by the severe adhesions, and, in the process of the surgery, removed the right ovary after observing what appeared to be a cyst on that ovary. For example, Dr. DeSalvo testified as follows:
 

 “Q: ... You’ve reviewed the operative note, haven’t you?
 

 “A: Yes.
 

 “Q: Does the operative note describe a fairly difficult operative area?
 

 “A: Yes.
 

 “Q: Was the — were the physicians able to see the left ovary?
 

 “A: No.
 

 “Q: Was that because of the scar tissue?
 

 “A: Yes.
 

 “Q If there is a lot of scar tissue and you can’t see the left ovary, does that pose risks to going to get it?
 

 “A: Yes.
 

 “Q: The greater the limitation of visibility by scar tissue is it the greater the risk of injuring a bowel or some other organ?
 

 “A: Correct.
 

 “Q: Okay. Did you see they were able to visualize the right adnexa?
 

 “A: Yes.
 

 [[Image here]]
 

 “Q: All right. And when the doctors saw the right adnexa, there ap
 
 *544
 
 peared to be a right ovarian enlargement and probable mass?
 

 “A: Yes.
 

 “Q: And would it be reasonable, knowing she had right-sided pain, knowing she had adhesions, seeing a right ovarian enlargement and probable mass, to remove it, given the discussions he had had with the patient?
 

 “A: Yes.
 

 “Q: And, in fact, that’s what [Dr. Ad-cock] did?
 

 “A: Yes.
 

 [[Image here]]
 

 “Q: ... Now one option, as I understand a doctor would have in this situation is, once he got in and saw the adhesions, would be just to quit, correct?
 

 “A: Yes. Yes.
 

 “Q: Of course, if he does that, he doesn’t address the pain on either side, does he?
 

 “A: Correct.
 

 “Q: All right. And another option would be to continue laparoscopi-eally and try to get to that left ovary, wouldn’t it?
 

 “A: Yes.
 

 “Q: And, of course, you’ve already said there would be increased risk to the patient if you did that. If a doctor did that and injured organs in the face of these heavy adhe-sions, could he fall below the standard of care?
 

 “A: You know, this is where judgment is important. You know, if — if he feels comfortable in doing it, I’m not going to fault somebody for— you know, for doing it. But if he feels that it’s not appropriate, then, you can’t fault him for saying it’s not appropriate.
 

 [[Image here]]
 

 “Q: And if the decision was made that we don’t think it’s safe for this patient to go get the left ovary, that would be reasonable on then-part, wouldn’t it?
 

 “A: Yes.
 

 “Q: Okay: Now, once the right ovary was removed, we’ve already talked about the fact that there was documented [in the surgical pathology report] that there was a corpus luteum cyst, an old hemorrhagic cyst [on the right ovary], correct?
 

 “A: Yes. Yes.
 

 “Q: The mass, in hindsight, that [Dr. Adcock] probably saw, do you think that was scar tissue and ovary and tube or what?
 

 “A: I don’t know.
 

 “Q: Okay. Would the doctors who did the operation be in the best position to speak to that?
 

 “A: Yeah. Yes.
 

 “Q: I mean, the fact that the pathology report doesn’t show some big mass isn’t inconsistent with what they saw clinically during the operation, is it?
 

 “A: Correct.”
 

 However, testifying elsewhere in his deposition, Dr. DeSalvo expressed his opinion that Dr. Adcock breached the standard of care because, according to Dr. DeSalvo, Dr. Adcock entered the operating room intending to remove the right ovary, not the left one. According to Dr. DeSalvo, Dr. Adcock entered the operating room with the mistaken belief that the right ovary was the ovary that had been previously diagnosed with a cyst based on the ultrasound images. Dr. DeSalvo took the position that, if Dr. Adcock had realized that the left ovary was the ovary diag
 
 *545
 
 nosed with a cyst, Dr. Adcock would have removed neither ovary, both ovaries, or only the left ovary, but would not have removed only the right ovary. In this regard, Dr. DeSalvo testified:
 

 “[Dr. DeSalvo]: Okay, let’s make some assumptions. Let’s assume that one ovary needs to come out and let’s assume that it’s the left ovary because that’s the thing we’ve imaged fifty times. ... So, if you’re going to get one of them, you’ve got to get the left, okay? Because that’s the one that images abnormal, okay?
 

 “So, if you can happen to also get to the right side, then, you get the right side. So ... [Dr. Adcock] never had any intention of getting the left. ... And that is supported by his preoperative diagnosis being right complex ovarian cyst and it’s also supported by the fact that the consent had to be changed. ... In that consent, it doesn’t say ‘bilateral’, but it’s okay to take out the right, absolutely. But if you’re going to get one, get the [left].
 

 “Q: Why didn’t he get the left?
 

 [[Image here]]
 

 “A. Because he couldn’t see it. But if you’re going to get one, get the ... left ovary.
 

 [[Image here]]
 

 “So ... in my mind, you guys are all focusing on the right ovary. It’s a distraction. It’s a very simple process. Left ovary, left ovary, left ovary, left ovary. Telephone call, right ovary, and then [Dr. Adcock] writes right ovary. Where did it go from left to right? There was a discrepancy in communication. That’s where the error was made. ... The error was that [Dr. Adcock] thought the cyst was on the ... right side and that’s ... the whole crux of the case.”
 

 At a later point in his deposition, Dr. DeSalvo testified similarly:
 

 “[Dr. DeSalvo:] ... [W]hen you review a case, you have to try to understand what was going on and how it was going on. At [the conclusion of the operation] before anything else happened except finished [sic] the operation, [Dr. Adcock] sits down writing some stuff down, he writes preoperative diagnosis was right complex ovarian cyst. That tells me, in his mind, that what brought this patient into this room was a right complex ovarian cyst. And that would explain why he operated on the right side only.
 

 “Had — had he known that it was a complex ovarian cyst on the left and that was the one that really needed to come out — you know, now this is, you know, Sunday quarterback, Monday morning quarterback — I’m the king of mixed metaphors — you know, what would he have done then? And again, that’s why I think the range of the standard of care is that he would have proceeded on the left side, he would have stopped or he would have opened her, that the reality is, is that the main thing that got her in the operating room wasn’t the right ovary, it was the left.”
 

 When a defense attorney asked Dr. DeSalvo to explain Dr. Adcock’s postoperative note made later in the evening on the date of the operation stating that Dr. Ad-cock attempted to access the left adnexa but was unable to do so because of the severe adhesions on that ovary, Dr. Desal-vo stated that he felt Dr. Adcock made that note because “at that time he realizes, because he has checked his records or whatever, that, okay, I should have taken the left out.” The defense attorney then questioned Dr. DeSalvo as follows:
 

 “Q: Now, what are you basing that on?
 

 “A: I’m basing that on—
 

 
 *546
 
 “Q: Are you basing that on what these lawyers have told you?
 

 “A: Discussions with — everything.
 

 “Q: Well, you told me before that what’s important is what’s in the record. Now, where are you getting this evidence?
 

 ‘‘A: How else — there’s no evidence.
 

 “Q. Where are you getting this evidence?
 

 “A. How else can I explain the difference in [Dr. Adcock’s] preoperative diagnosis that’s handwritten twice that says right side and, then, his dictation at 5:00 p.m. that says left side?
 

 :‘Q. He had the consent and the authority to remove either or both [ovaries], didn’t he?
 

 ‘A. He had the consent and the authority to do just that, yes.
 

 ‘Q: Okay, thank you. Now—
 

 ‘A: But it doesn’t make sense as to why he didn’t remove the left.
 

 ‘Q: Well—
 

 ‘A: The preoperative diagnosis was left ovarian cyst.
 

 ‘Q: Yes.
 

 ‘A: He says it on the dictation.
 

 ‘Q: All right, assume—
 

 ‘A: So, why do you proceed with a difficult operation, cherry picking the one that’s easy and never getting the one that’s hard?
 

 ‘Q: Assume for me that he went in expecting a left complex ovarian cyst and he couldn’t get to it, first of all.
 

 ‘A: Wonderful, then stop. We’ll open her up.
 

 ‘Q: You’ve already testified it would be reasonable, if he saw an explanation on the right side, to go remove the right one, wouldn’t you?
 

 “A: Preoperative diagnosis is—
 

 “Q: No. No. Answer my question. Are you changing your testimony from what you said awhile ago?
 

 “A: The preoperative diagnosis was left ovarian cyst. ... Then, why is it written here right side? Why is it written here right side?
 

 “Q: And I — I’m not answering questions today.
 

 “A: Okay. That’s the question to me. That’s the whole case. That’s it.
 

 “Q: You said the focus — it’s a misplaced focus on the right side. Did you know that that’s why they— the claim in the lawsuit is that he shouldn’t have removed the right? Have you ever been told that?
 

 :‘A: No.
 

 :‘Q: Is this the — you mean to tell me we are five years out from this operation almost and the first time you’ve ever been told is me suggesting] it to you that they’re claiming he committed malpractice by removing the right? You didn’t know that?
 

 ‘A: No.
 

 [[Image here]]
 

 ‘Q: Dr. DeSalvo, during this operation, once he saw he couldn’t get to the left, was it an emergency to get the left ovary out that day?
 

 ‘A: No.
 

 ‘Q: Okay. Would it be reasonable to plan to come back and get it at a later time?
 

 ‘A: Yes.
 

 ‘Q: If he had written postoperatively, instead of right ovarian mass, left ovarian mass, you wouldn’t be criticizing him, would you?
 

 ‘A: No.
 

 
 *547
 
 “Q: We wouldn’t — you wouldn’t be sitting here today, would you?
 

 “A: No.”
 

 Elsewhere in his deposition, Dr. DeSalvo characterized the surgery as a “wrong-site surgery,” but he did not explain why he characterized the surgery as a “wrong-site surgery.”
 

 Finally, with regard to the infliction of the injury to Giles’s bowel, Dr. DeSalvo testified:
 

 “Q: You do not express any criticism of the doctors in this case by virtue of the fact that there was a bowel injury, do you?
 

 “A: No, sir.
 

 “Q: That’s an inherent and accepted risk of the procedure?
 

 “A: In this particular case, yes.”
 

 Dr. DeSalvo further testified regarding the cause of the bowel injury:
 

 “Q: All right. Now I know you said it doesn’t matter and I know you’re not critical, but do you have any opinion of how the bowel was injured?
 

 “A: I don’t think we — I think the best answer is we don’t know.
 

 “Q: Okay.
 

 “A: I think Dr. Adcock’s explanation is reasonable, but it’s not really germane, because I’m not—
 

 “Q: Okay.
 

 “A: It wasn’t a deviation.
 

 “Q: It doesn’t matter whether it was a laceration or an abrasion, does it?
 

 “A: This is when we talked earlier about — I’m not going to be critical about iatrogenic injuries. Because in this particular case, this was— unavoidable.”
 

 However, Dr. DeSalvo also testified that the infliction of the injury to Giles’s bowel represented a deviation from the standard of care because, he said, the injury occurred while Dr. Adcock was “trying to get out the right [ovary] because it was the left that he should have been trying to get out.” Dr. DeSalvo further testified that the right lower bowel could have been injured on the right side if Dr. Adcock had done a left-side surgery.
 

 Regarding post-surgery treatment of the bowel injury, Dr. DeSalvo testified that, based on his review of Giles’s medical records, at the time Giles was discharged from the hospital “there was no evidence of a bowel perforation at that time.” Dr. DeSalvo opined that, on November 13, 2001, when Giles returned to Dr. Adcock dehydrated and in pain, Dr. Adcock should have sent her to the hospital that same day for tests to investigate whether complications from a bowel injury were causing her problems. Dr. DeSalvo then testified:
 

 “Q: ... You understand that, [Giles], in fact, was admitted [to the hospital] the next day [November 14, 2001]?
 

 “A: Yes.
 

 “Q: Can we agree that, if she had been admitted on the 13th, as opposed to the 14th, her outcome would have been the same.
 

 “[Giles’s attorney]: We object to that. I think it’s speculative.
 

 “A: I don’t know that I can testify to that.
 

 “Q: Well, you can’t testify, then, that admitting her on the 13th would have changed her outcome, can you?
 

 “A: I think that, as a gynecologist, I can testify to the standard of care for the management of postoperative gynecologic surgery.
 

 “Q: And I’m asking about causation?
 

 “A: And that’s where I’m, you know, I don’t pretend to be a general surgeon.
 

 
 *548
 
 “Q: Okay. And fair enough, because that’ll save me a bunch of questions. You’re not going to testify on causation in this case, then, are you?
 

 “A: You know, would it have made a difference for day five or day six, you know, the 13th or the 14th? No. I don’t have the knowledge to testify to that.”
 

 Standard of Review
 

 ‘““This Court’s review of a summary judgment is de novo.
 
 Williams v. State Farm Mut. Auto. Ins. Co.,
 
 886 So.2d 72, 74 (Ala.2003). We apply the same standard of review as the trial court applied. Specifically, we must determine whether the movant has made a prima facie showing that no genuine issue of material fact exists and that the movant is entitled to a judgment as a matter of law. Rule 56(c), Ala. R. Civ. P.;
 
 Blue Cross & Blue Shield of Alabama v. Hodurski,
 
 899 So.2d 949, 952-53 (Ala.2004). In making such a determination, we must review the evidence in the light most favorable to the nonmovant.
 
 Wilson v. Brown,
 
 496 So.2d 756, 758 (Ala.1986). Once the movant makes a prima facie showing that there is no genuine issue of material fact, the burden then shifts to the nonmovant to produce ‘substantial evidence’ as to the existence of a genuine issue of material fact.
 
 Bass v. South-Trust Bank of Baldwin County,
 
 538 So.2d 794, 797-98 (Ala.1989); Ala.Code 1975, § 12-21-12. ‘[Substantial evidence is evidence of such weight and quality that fair-minded persons in the exercise of impartial judgment can reasonably infer the existence of the fact sought to be proved.’
 
 West v. Founders Life Assur. Co. of Fla.,
 
 547 So.2d 870, 871 (Ala.1989).” ’ ”
 

 Gooden v. City of Talladega,
 
 966 So.2d 232, 235 (Ala.2007) (quoting
 
 Prince v. Poole,
 
 935 So.2d 431, 442 (Ala.2006)).
 

 Analysis
 

 A. Giles’s malpractice claims against Dr. Perry
 

 We first consider whether a genuine issue of material fact exists as to Giles’s malpractice claims against Dr. Perry and whether Dr. Perry is entitled to judgment as a matter of law on those claims. To prevail on her medical-malpractice claim against Dr. Perry, Giles must prove, among other things, that Dr. Perry violated the duty to “ ‘exercise such reasonable care, diligence, and skill as physicians ... in the same general neighborhood, and in the same general line of practice, ordinarily have and exercise in a like case.’ ”
 
 Pruitt v. Zeiger,
 
 590 So.2d 236, 237 (Ala.1991) (quoting Ala.Code 1975, § 6-5-484(a)). Furthermore, under the circumstances of this case, Giles must establish the standard of care applicable to Dr. Perry and Dr. Perry’s breach thereof through expert testimony.
 
 See
 
 590 So.2d at 237-38.
 
 [4]
 
 However, Giles submitted no expert testimony indicating that Dr. Perry was in any way negligent with regard to her medical care and treatment. Giles’s medical expert, Dr. Anthony DeSalvo, acknowledged during his deposition he was “in no way expressing any criticisms of Dr. Perry in this case.” Therefore, no genuine issue of material fact exists as to Giles’s
 
 *549
 
 malpractice claims against Dr. Perry, and Dr. Perry is entitled to judgment as a matter of law on those claims. We affirm the trial court’s judgment in favor of Dr. Perry with regard to Giles’s malpractice claims against him.
 

 B. Giles’s malpractice claims against Dr. Adcock
 

 We next consider whether the summary judgment was appropriate with regard to Giles’s malpractice claims against Dr. Adcock. To prevail on a medical-malpractice claim, a plaintiff must prove “ T) the appropriate standard of care, 2) the doctor’s deviation from that standard, and 3) a proximate causal connection between the doctor’s act or omission constituting the breach and the injury sustained by the plaintiff.’ ”
 
 Pruitt,
 
 590 So.2d at 238 (quoting
 
 Bradford v. McGee,
 
 534 So.2d 1076, 1079 (Ala.1988)). With exceptions not applicable in this case, the plaintiff “must ... establish the defendant physician’s negligence through expert testimony as to the standard of care and the proper medical treatment.” 590 So.2d at 237-38. The plaintiff must also “prove by expert testimony that the physician breached the standard of care and by the breach proximately caused the plaintiffs injury.”
 
 University of Alabama Health Servs. Found. v. Bush,
 
 638 So.2d 794, 798 (Ala.1994).
 

 Dr. Adcock carried his burden, as the movant for summary judgment, to establish that no genuine issue of material fact existed and that he was entitled to judgment as a matter of law on Giles’s medical-malpractice claims. Specifically, Dr. Adcock submitted his own affidavit setting forth his qualifications as an expert in the field of gynecology, his familiarity with the standard of care and with Giles’s case, his opinion that his treatment of Giles met the standard of care, and his opinion that “nothing [he] did or failed to do in any way caused or contributed to the injuries alleged in [Giles’s] Complaint.”
 

 Therefore, the burden then shifted to Giles to produce substantial evidence demonstrating the existence of a genuine issue of material fact.
 
 See Gooden v. City of Talladega,
 
 966 So.2d 232, 235 (Ala.2007) (quoting
 
 Prince v. Poole,
 
 935 So.2d 431, 442 (Ala.2006)). The malpractice claims against Dr. Adcock as alleged in Giles’s complaint center around three basic theories: first, that in failing to abandon the laparoscopic surgery altogether or to perform an open laparotomy for removal of the left ovary after discovering severe adhesions obscuring the left adnexum Dr. Adcock did not meet the standard of care; second, that Dr. Adcock negligently injured Giles’s bowel during the surgery; and, third, that Dr. Adcock failed to treat the bowel injury properly. Giles’s medical expert opined that Dr. Adcock breached the standard of care in that he performed the surgery while under the mistaken belief that the right ovary, not the left, was the ovary that had been diagnosed with a cyst before the surgery. According to Giles’s expert, Dr. Adcock violated the standard of care by removing the right ovary only but would have met the standard of care had he removed the left ovary only, both ovaries, or neither ovary.
 

 Giles points to Dr. Simmons’s surgical pathology report, particularly Dr. Simmons’s observation of “no gross abnormalities” on the cut section of the right ovary and his diagnosis of “[n]o pathologic abnormality” as evidence indicating that the right ovary was normal and should not have been removed during the surgery. However, Giles presented
 
 no
 
 expert testimony to the effect that one could infer from Dr. Simmons’s surgical pathology report that Dr. Adcock’s action in removing the right ovary was below the standard of
 
 *550
 
 care. Rather, Giles’s medical expert, Dr. DeSalvo,
 
 confirmed,
 
 that the findings in the pathology report were
 
 not
 
 inconsistent with Dr. Adcock’s observations of an abnormality in the operating room that led him to remove Giles’s right ovary. Dr. DeSalvo also testified that, given Giles’s medical history and complaints and the observations of the physicians in the operating room, removing the right ovary was a reasonable action. Thus, the fact that no. pathologic abnormality was ultimately found on the right ovary when the ovary was examined in the laboratory does not, on this record, constitute substantial evidence indicating that Dr. Adcock’s actions in removing the right ovary during the operation fell below the standard of care.
 

 Further, the testimony of Giles’s medical expert is not sufficient to satisfy Giles’s burden of producing substantial evidence demonstrating the existence of a genuine issue of material fact as to her medical-malpractice claims against Dr. Ad-cock. Even if portions of her expert’s testimony could be said to be sufficient to defeat a summary-judgment motion when viewed “abstractly, independently, and separately from the balance of his testimony,” “we are not to view testimony so abstractly.”
 
 Hines v. Armbrester, 477
 
 So.2d 302, 304 (Ala.1985).
 
 See also Malone v. Daugherty,
 
 453 So.2d 721, 723-24 (Ala.1984). Rather, as this Court stated in
 
 Hines:
 

 “We are to view the [expert] testimony as a whole, and, so viewing it, determine if the testimony is sufficient to create a reasonable inference of the fact the plaintiff seeks to prove. In other words, can we say, considering the entire testimony of the plaintiffs expert, that an inference that the defendant doctor had acted contrary to recognized standards of professional care was created?”
 

 477 So.2d at 304-05;
 
 see also Pruitt v. Zeiger,
 
 590 So.2d 236, 239 (Ala.1991) (quoting
 
 Hines, 477
 
 So.2d at 304-05).
 

 Similarly, in
 
 Malone v. Daugherty, supra,
 
 another medical-malpractice case, we noted that a portion of the plaintiffs medical expert’s testimony in that case,
 

 “when viewed abstractly, independently, and separately from the balance of his sworn statement, would appear sufficient to defeat the [defendant’s] motion for summary judgment. But our review of the evidence cannot be so limited. The test is whether [the plaintiffs medical expert’s] testimony, when viewed as a whole, was sufficient to create a reasonable inference of the fact Plaintiff sought to prove. That is to say, could a jury, as the finder of fact, reasonably infer from this medical expert’s testimony, or any part thereof when viewed against the whole, that the defendant doctor had acted contrary to the recognized standards of professional care in the instant case.
 

 “Thus, in applying this test, we must examine the expert witness’s testimony as a whole.”
 

 453 So.2d at 723;
 
 see also Downey v. Mobile Infirmary Med. Ctr.,
 
 662 So.2d 1152, 1154 (Ala.1995) (noting that portions of a medical expert’s testimony must be viewed in the context of the expert’s testimony as a whole);
 
 Pendarvis v. Pennington,
 
 521 So.2d 969, 970 (Ala.1988) (“[W]e are bound to consider the expert testimony as a whole.”).
 

 Viewed as a whole, Dr. DeSalvo’s testimony does not create a reasonable inference that Dr. Adcock violated the standard of care or performed a “wrong-site surgery” when, after discovering severe adhesions obscuring the left adnexum, he did not abandon the laparoscopic surgery altogether or perform an open lapa-rotomy to remove the left ovary. Dr. Ad-
 
 *551
 
 cock’s testimony and postoperative notes indicate that he did not remove the left ovary because he found extensive adhe-sions that prevented him from adequately visualizing the left adnexum. There was not substantial evidence contradicting Dr. Adcock’s evidence that he investigated removing the left ovary but decided not to proceed with removing that ovary because of the adhesions. Dr. DeSalvo testified in deposition that deciding not to proceed with removing the left ovary after discovering the extent of the adhesions on the left adnexum would fall within the standard of care. Further, Dr. DeSalvo testified that proceeding with the laparoscopy, checking the right ovary for abnormalities, and removing the right ovary after discovering what appeared to be a cyst on the right ovary would also have been within the standard of care, given Dr. Adcock’s observations when he looked at the right ovary during the surgical procedure. Thus, in light of his testimony as a whole, the portions of Dr. DeSalvo’s testimony cited by Giles, including his conclusory statements that Dr. Adcock performed a “wrong-site surgery,” do not constitute substantial evidence indicating that Dr. Adcock in fact operated on the “wrong site” when he removed the right ovary or that his actions in not abandoning the surgery altogether or converting the procedure to an open laparotomy after viewing the extent of the adhesions on the left ovary fell below the applicable standard of care.
 

 Further, Dr. DeSalvo’s opinion that Dr. Adcock violated the standard of care by performing the surgery under the mistaken belief that the right ovary, not the left, was the ovary that had been diagnosed before the surgery with a cyst also does not amount to substantial evidence of malpractice when viewed in light of Dr. DeSalvo’s testimony as a whole. According to Dr. DeSalvo, Dr. Adcock would not have removed
 
 only
 
 the right ovary had he realized it was the left ovary that had previously been diagnosed as abnormal. As Dr. DeSalvo testified:
 

 “Had — had [Dr. Adcock] known that it was a complex ovarian cyst on the left and that was the one that really needed to come out — you know, now this is, you know, Sunday quarterback, Monday morning quarterback — I’m the king of mixed metaphors — you know, what would he have done then? And again, that’s why I think the range of the standard of care is that he would have proceeded on the left side, he would have stopped or he would have opened her, that the reality is, is that the main thing that got her in the operating room wasn’t the right ovary, it was the left.”
 

 Assuming for the sake of argument that Dr. DeSalvo correctly described Dr. Ad-cock’s belief during the surgery as to which ovary had previously been diagnosed as having a cyst, Dr. DeSalvo’s testimony, taken as a whole, does not constitute substantial evidence that any belief by Dr. Adcock that the previously diagnosed cyst was located on the right ovary rather than the left caused him to remove the “wrong” ovary in this case or to otherwise negligently perform the surgery.
 
 See University of Alabama Health Servs. Found. v. Bush,
 
 638 So.2d at 798 (noting that a plaintiff in a medical-malpractice case must prove through expert testimony that the defendant physician’s breach of the standard of care proximately caused the plaintiffs injury). The
 
 uncontradicted
 
 evidence establishes that, regardless of which ovary he believed had been previously diagnosed as having a cyst, Dr. Ad-cock investigated removing
 
 both
 
 ovaries during the procedure, decided not to remove the left ovary because of the risks and difficulties posed by the severe adhe-sions surrounding that ovary, and removed
 
 *552
 
 the right ovary after the laparoscopy revealed what appeared to be a cyst on that ovary. Dr. DeSalvo opined that each of these three actions met the applicable standard of care. Thus, although Dr. DeSalvo testified that Dr. Adcock had breached the standard of care by entering the operating room under a mistaken belief as to which ovary had previously been diagnosed with a cyst, neither Dr. DeSal-vo’s testimony as a whole nor any part of it when viewed against the whole supports the theory that Dr. Adcock’s belief as to which ovary was previously diagnosed with a cyst
 
 proximately caused any injury to Giles in this particular case. See Bush,
 
 638 So.2d at 798;
 
 see also Malone,
 
 453 So.2d at 723-24;
 
 Downey v. Mobile Infirmary Med. Ctr.,
 
 662 So.2d 1152, 1154 (Ala.1995) (“This Court has consistently held that the testimony of an expert witness in a medical malpractice case must be viewed as a whole, and that a portion of it should not be viewed abstractly, independently, or separately from the balance of the expert’s testimony.”);
 
 Pruitt,
 
 590 So.2d at 239 (quoting
 
 Hines,
 
 477 So.2d at 304-05);
 
 Pendarvis v. Pennington,
 
 521 So.2d at 970;
 
 Hines,
 
 477 So.2d at 304.
 

 Additionally, when Mr. Giles’s affidavit is viewed, as it must be, in the light most favorable to Giles, Dr. Adcock’s apologies to Mr. Giles do not constitute expert testimony that he injured Giles by breaching the standard of care.
 

 “ ‘The expert testimony which establishes plaintiffs prima facie case may be that of defendant, and extrajudicial admissions of defendant have the same legal competency as direct expert testimony to establish the critical averments of the complaint, provided the statement' constitutes an admission of negligence of lack of the skill ordinarily required for the performance of the work undertaken; an extrajudicial statement amounting to no more than an admission of bona fide mistake of judgment or untoward result of treatment is not alone sufficient to permit the inference of breach of duty. ... ’”
 

 Pappa v. Bonner,
 
 268 Ala. 185, 191, 105 So.2d 87, 92 (1958) (quoting 70 C.J.S.
 
 Physicians and Surgeons
 
 § 62, pp. 1008-09). When every reasonable factual inference is taken in Giles’s favor, Dr. Adcock’s apologies, at most, amount to an admission that he operated on Giles while he was under the impression that the right ovary, rather than the left, was the ovary that had been previously diagnosed with a cyst. Further, Dr. Adcock’s apologies indicate that he would have performed the surgery differently had he realized during the surgery that the left ovary was the ovary previously diagnosed with a cyst. However, Dr. Adcock’s apologies, as recounted in Mr. Giles’s affidavit, do not contradict the evidence indicating that Dr. Adcock investigated removing both ovaries, decided not to proceed with removing the left ovary after evaluating the risks and difficulties of removing that ovary, and removed the right ovary after discovering what appeared to be a cyst on that ovary. Dr. Adcock’s apologies also do not contradict his testimony and the testimony of Giles’s expert that each of these three actions fell within the standard of care. In light of the testimony from Giles’s expert as well as from Dr. Adcock that each element of the surgery
 
 as actually performed
 
 met the standard of care, it cannot be said that Dr. Adcock|s apologies qualify as “ ‘an admission of negligence of lack of the skill ordinarily required for the performance of the work undertaken’ ” rather than “ ‘no more than an admission of bona fide mistake of judgment or untoward result of treatment.’ ”
 
 Pappa,
 
 268 Ala. at 191, 105 So.2d at 92. Therefore, Mr. Giles’s account of Dr. Adcock’s apologies does not provide substantial evidence creating a genuine is
 
 *553
 
 sue of material fact with regard to Giles’s claims that Dr. Adcock committed malpractice—that is, that he negligently
 
 caused injury
 
 to Mrs. Giles—by removing the right ovary and not removing the left or by entering the operating room under the mistaken belief that the right ovary, not the left, had previously been diagnosed with a cyst.
 

 As to the injury to Giles’s bowel, Dr. DeSalvo testified that the infliction of the injury was “unavoidable” and “wasn’t a deviation” from the standard of care. Dr. DeSalvo later testified, after a break and upon questioning by Giles’s attorney, that the bowel injury represented a deviation from the standard of care in that the injury occurred while Dr. Adcock was “trying to get out the right [ovary] because it was the left that he should have been trying to get out.” However, as explained above, Dr. DeSalvo’s testimony as a whole does not provide substantial evidence indicating that Dr. Adcock breached the standard of care by removing the right ovary. Rather, Dr. DeSalvo affirmatively testified multiple times that investigating and ultimately removing the right ovary during the surgery fell within the standard of care. Taken as a whole, therefore, Dr. DeSalvo’s testimony cannot reasonably be interpreted as providing substantial evidence that Dr. Ad-cock injured Giles’s bowel as a result of breaching the standard of care.
 

 Dr. DeSalvo’s testimony also fails to create a genuine issue as to whether Dr. Adcock breached the standard of care or injured Giles by failing to timely or adequately treat Giles’s bowel injury. Although Dr. DeSalvo criticized Dr. Adcock for waiting until November 14, 2001, to readmit Giles to the hospital for treatment of the bowel injury, Dr. DeSalvo further testified that he was not qualified to say whether waiting until November 14 to admit Giles to the hospital made any difference in Giles’s case. Taken as a whole, with every reasonable inference drawn in favor of Giles, Dr. DeSalvo’s testimony does not constitute substantial evidence that Dr. Adcock’s treatment of Giles’s bowel complications fell below the standard of care or caused Giles any further injury.
 
 Bush,
 
 638 So.2d at 798 (stating that the plaintiff in a medical-malpractice action must prove by expert testimony that, by breaching the standard of care, “the physician ... proximately caused the plaintiffs injury”).
 

 For these reasons, Giles has not carried her burden to rebut Dr. Adcock’s
 
 prima facie
 
 showing that no genuine issue of material fact exists. Dr. Adcock was entitled to judgment as a matter of law on Giles’s malpractice claims, and the trial court correctly entered a summary judgment on those claims against him.
 

 C. Medical-negligence claims against Brookwood
 

 Giles’s medical-negligence claims against Brookwood are based on allegations that various acts or omissions of Brookwood or its agents caused Dr. Adcock to perform a “■wrong-site” surgery when he removed only her right ovary. As explained above, however, Giles failed to produce substantial evidence creating a genuine issue of material fact as to whether the removal of her right ovary was, in fact, a “wrong-site surgery” rather than the proper exercise of Dr. Adcock’s professional judgment falling within the standard of care governing the operation. Therefore, Giles has also failed to produce evidence creating a genuine issue of material fact as to her medical-negligence claims against Brookwood.
 

 D. Failure-to-obtain-informed-consent claims
 

 “The elements of a cause of action against a physician for failure to
 
 *554
 
 obtain informed consent are: (1) the physician’s failure to inform the plaintiff of all material risks associated with the procedure, and (2) a showing that a reasonably prudent patient, with all the characteristics of the plaintiff and in the position of the plaintiff, would have declined the procedure had the patient been properly informed by the physician.”
 

 Phelps v. Dempsey,
 
 656 So.2d 377, 380 (Ala.1995) (citing
 
 Fain v. Smith,
 
 479 So.2d 1150 (Ala.1985);
 
 Fore v. Brown,
 
 544 So.2d 955 (Ala.1989)).
 

 The test for determining whether the physician has disclosed all the material risks to a patient is
 

 “a professional one,
 
 ie.,
 
 whether the physicians had disclosed all the risks which a medical doctor practicing in the same field and in the same community would have disclosed. Expert testimony is required to establish what the practice is in the general community.”
 

 Fain,
 
 479 So.2d at 1152.
 

 Dr. Adcock established a
 
 prima facie
 
 case that no genuine issue of material fact existed as to the first element of Giles’s failure-to-obtain-informed-consent claim and that he was entitled to judgment as a matter of law on that claim. According to Dr. Adcock’s testimony and medical notes, he had certain conversations with Giles regarding the intended scope and potential risks of the operation, including the possibility that either or both ovaries would be removed. Dr. DeSalvo testified that the conversations described by Dr. Adcock’s testimony and his contemporaneous notes would have met the standard for informing Giles that he might remove either ovary, or both, and the risks and long-term effects of doing so.
 

 Therefore, the burden then shifted to Giles to put forth evidence creating a genuine issue of material fact as to whether Dr. Adcock failed to inform her of all material risks associated with the procedure. Giles did not meet this burden. She submitted no evidence that the conversations Dr. Adcock described did not occur. At most, she provides evidence indicating that she does not recall whether Dr. Adcock had those conversations with her. Giles’s inability to recall those conversations does not constitute substantial evidence that the conversations did not occur, only that she cannot remember whether they occurred or what Dr. Adcock discussed with her. Therefore, no genuine issue of material fact exists, and Dr. Ad-cock is entitled to judgment as a matter of law on Giles’s failure-to-obtain-informed-consent claim.
 

 Giles’s failure-to-obtain-informed-consent claims against the remaining defendants fail as well, because there is no genuine issue of material fact as to whether she was informed of the material risks associated with the procedure, and Giles has produced no evidence, legal authority, or argument to suggest that the other defendants breached a duty to provide her with information beyond that provided by Dr. Adcock or to obtain her consent.
 

 E. Spoliation-of-evidence claims
 

 On appeal, Giles makes no argument and cites no authority in support of her claims against the defendants alleging spoliation of evidence; thus, she has abandoned any challenge to the summary judgment on those claims, and we affirm the trial court’s summary judgment on those claims.
 
 Butler v. Town of Argo,
 
 871 So.2d 1, 20 (Ala.2003)(“ ‘[I]t is not the function of this Court to do a party’s legal research or to make and address legal arguments for a party (quoting
 
 Dykes v. Lane Trucking, Inc.,
 
 652 So.2d 248, 251 (Ala.1994))); cf
 
 . Chunn v. Whisenant,
 
 877 So.2d
 
 *555
 
 595, 598 n. 2 (Ala.2003);
 
 Stover v. Alabama Farm Bureau Ins. Co.,
 
 467 So.2d 251, 253 (Ala.1985) (“While we attempt to avoid dismissing appeals or affirming judgments on what may be seen as technicalities, we are sometimes unable to address the merits of an appellant’s claim when the appellant fails to articulate that claim and presents no authorities in support of that claim.”).
 

 F. Giles’s claims against OB-GYN South
 

 OB-GYN South did not move for a summary judgment. The trial court, however, entered a summary judgment for OB-GYN South because Giles’s claims against OB-GYN South were derivative of her claims against Dr. Adcock and Dr. Perry and because the trial court concluded that Dr. Adcock and Dr. Perry were entitled to a summary judgment on all claims against them.
 

 Regarding the summary judgment for OB-GYN South, Giles presents the following argument:
 

 “The summary ... judgment in favor of Dr. Adcock and hence OB[-]GYN South should be reversed .... OB[-]GYN South had not filed a [summary-judgment] motion and on this ground alone [the summary-judgment in favor of OB-GYN South] might be subjected to reversal but as the [trial] court aptly noted the action against [OB-GYN South] is a derivative of the claim[s] against Dr. Adcock and [Dr.] Perry hence the Summary Judgment in [OB-GYN South’s] favor should be reversed.”
 

 This Court has previously held that “a trial court should not
 
 sua sponte
 
 enter a summary judgment in favor of a party who has not filed a motion seeking such a judgment without affording ‘an opportunity to present evidence in opposition to it.’ ”
 
 Alpine Assoc. Indus. Servs. v. Smitherman,
 
 897 So.2d 391, 395 (Ala.2004) (quoting
 
 Moore v. Prudential Residential Servs. Ltd. P’ship,
 
 849 So.2d 914, 927 (Ala.2002)). This is because “ ‘[o]ne
 
 purpose of the procedural rights to notice and hearing under Rule 56(c)[ Ala.R.Civ.P.,J is to allow the nonmoving party the opportunity to discover and to present evidence opposing the motion for summary judgment.
 
 ’ ”
 
 Moore,
 
 849 So.2d at 927 (quoting
 
 Van Knight v. Smoker,
 
 778 So.2d 801, 805 (Ala.2000)). We have reversed summary judgments when neither party had filed a summary-judgment motion and also when the losing party had no notice that a summary judgment could be forthcoming and no opportunity to present evidence in opposition to the summary judgment.
 
 See, e.g., Moore,
 
 849 So.2d at 927 (“Because Rule 56 requires, at the least, that the nonmoving party be provided with notice of a summary-judgment motion and be given an opportunity to present evidence in opposition to it, the trial court violates the rights of the nonmoving party if it enters a summary judgment on its own, without any motion having been filed by a party.”). “
 
 ‘Rule 56 “is not prefaced upon whether or not the opposing party may successfully defend against summary judgment, [but] it does require that the opportunity to defend be given
 
 ” ’ ” (quoting
 
 Van Knight,
 
 778 So.2d at 806, quoting in turn
 
 Tharp v. Union State Bank,
 
 364 So.2d 335, 338 (Ala.Civ.App.1978)), although the right to notice of a potential summary judgment may be waived.
 
 See id.
 

 Giles does not argue that the summary judgment in favor of OB-GYN South was improper because she had no notice or opportunity to present evidence in opposition to such a judgment. Giles’s statement that the summary judgment “might” be reversed because OB-GYN South did not file a motion is not sufficient to state or support an argument that Giles had no opportunity to oppose the summary judg
 
 *556
 
 ment for OB-GYN South. Giles concedes that the trial court “aptly noted” that her claims against OB-GYN South are derivative of her claims against Dr. Adcock and Dr. Perry. Because her claims against OB-GYN South are premised solely on the principle of
 
 respondeat superior,
 
 Giles’s claims against OB-GYN South require proof of the same elements as her claims against Dr. Adcock and Dr. Perry and are premised on the same facts.
 
 Cf., e.g., United Steelworkers of Am. AFL-CIO-CLC v. O’Neal,
 
 437 So.2d 101, 103 (Ala.1983). (“In a joint action in tort for misfeasance or malfeasance against an agent and his principal, where
 
 respondeat superior
 
 is the sole basis of recovery, a verdict in favor of the agent works an automatic acquittal of the principal so that a verdict against him must be set aside.”).
 

 Giles presented briefs, arguments, and evidence to the trial court in opposition to the summary-judgment motions of Dr. Ad-cock and Dr. Perry. Under the circumstances of this case, Giles had sufficient notice and opportunity to fully present all legal arguments and all relevant evidence in opposition to the summary judgment the trial court ultimately entered in favor of OB-GYN South on the ground that Dr. Adcock and Dr. Perry were entitled to summary judgment.
 
 Cf. Bibbs v. MedCenter Inns of Alabama, Inc.,
 
 669 So.2d 143, 144
 
 &
 
 n. 1 (Ala.1995).
 

 Giles contests the summary judgment in favor of OB-GYN South by arguing that Dr. Adcock and Dr. Perry are not entitled to a summary judgment; therefore, she argues, OB-GYN South is not entitled to a summary judgment. Because we hold that Dr. Adcock and Dr. Perry are entitled to a summary judgment on all claims against them, we reject Giles’s contention that OB-GYN South is not entitled to a summary judgment on the ground that, according to Giles, Dr. Adcock and Dr. Perry are not entitled to summary judgment.
 

 Accordingly, we affirm the summary judgment in favor of OB-GYN South.
 
 See Celotex Corp. v. Catrett,
 
 477 U.S. 317, 323-24, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) (“One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses, and we think it should be interpreted in a way that allows it to accomplish this purpose.” (footnote omitted));
 
 Burton v. City of Belle Glade,
 
 178 F.3d 1175, 1203-04 (11th Cir.1999) (“A [trial] court possesses the power to enter summary judgment
 
 sua sponte
 
 provided the losing party ‘was on notice that she had to come forward with all of her evidence.’ ” (quoting
 
 Celotex,
 
 477 U.S. at 326, 106 S.Ct. 2548));
 
 Ex parte Novartis Pharms. Corp.,
 
 975 So.2d 297, 300 n. 2 (Ala.2007) (“Federal cases construing the Federal Rules of Civil Procedure are persuasive authority in construing the Alabama Rules of Civil Procedure, which were patterned after the Federal Rules of Civil Procedure.” (citing
 
 Borders v. City of Huntsville,
 
 875 So.2d 1168, 1176 n. 2 (Ala.2003))); 10A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane,
 
 Federal Practice and Procedure
 
 § 2720 (1998) (“The major concern in cases in which the court wants to enter summary judgment without a Rule 56 motion by either party is not really one of power. ... Rather, the question raised ... is whether the party against whom the judgment will be entered was given sufficient advance notice and an adequate opportunity to demonstrate why summary judgment should not be granted. ... If the court provides this opportunity, however, there seems to be no reason for preventing the court from acting on its own. To conclude otherwise would result in unnecessary trials and would be inconsistent with the objective of Rule 56 of expediting the disposition of cases.” (footnotes omit
 
 *557
 
 ted));
 
 see also
 
 Rule 56, Ala. R. Civ. P., Committee Comments on 1973 Adoption (“ ‘Summary judgment ... is a liberal measure, liberally designed for arriving at the truth. Its purpose is not to cut litigants off from their right of trial by jury if they really have evidence which they will offer on a trial[;] it is to carefully test this out[ ] in advance of trial by inquiring and determining whether such evidence exists.’ ” (quoting
 
 Whitaker v. Coleman,
 
 115 F.2d 305, 307 (5th Cir.1940))).
 

 Conclusion
 

 No genuine issue of material fact exists, and the defendants are entitled to a judgment as a matter of law on Giles’s claims against them. Therefore, we affirm the summary judgment.
 

 AFFIRMED.
 

 SEE, WOODALL, SMITH, and PARKER, JJ., concur.
 

 [1]
 

 . Dr. Anthony DeSalvo, Giles’s medical expert, testified that the term ’’andexum” refers to the fallopian tube and ovary.
 

 [2]
 

 . The record does not indicate whether the "O.R. Journal” is a document from the records of Brookwood, OB-GYN South, or some other entity. The record also does not indicate the identity of the person who submitted the August 28, 2001, request to schedule an operating room for a left oophorectomy for Giles.
 

 [3]
 

 . The record does not include Dr. Emig’s first name.
 

 [4]
 

 . In
 
 Pruitt,
 
 this Court noted the usual rule that the plaintiff in a medical-malpractice action must prove the standard of care and the physician’s breach of the standard of care by expert testimony and that an exception to the usual rule exists when "tire breach of the standard of care is obvious to the average layperson.”
 
 Pruitt,
 
 590 So.2d at 238. This exception is not applicable to the treatment provided by Dr. Perry or the other defendants in this case.